**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

KELLY JEAN ALCANTAR,

               Plaintiff,

     v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

         Defendant.

_____

Case No.  1:14-cv-00182-SKO

**ORDER ON PLAINTIFF'S COMPLAINT**

(Doc. 19)

## I.   INTRODUCTION

Plaintiff, Kelly Jean Alcantar ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

_____

[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8; 10.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on December 20, 1958, and alleges disability beginning on March 30, 2008.  (AR 57; 146; 158-59; 193-99; 255; 274.)  Plaintiff's date last insured was September 30, 2011.  (AR 57; 146; 193; 255; 274.)  Plaintiff claims she is disabled due to degenerative disc disease, lupus, arthritis, fibromyalgia, and bipolar disorder.  (*See* AR 44; 96; 105; 198.)

### A.     Relevant Medical Evidence

Plaintiff was described as having the following: "mood disorder" and "pain" on June 5, 2009, "rheumatoid arthritis" on January 24, 2010, "insomnia" on May 5, 2011, and "sleep disorder" on October 24, 2011.  (AR 664; 681.)  It is not entirely clear from the record what medical facility and what medical practitioner, if any, made these diagnoses or upon what specific objective or subjective criteria these diagnoses were based.  (*See* AR 664.)

On November 16, 2010, Plaintiff was seen by Dr. Matthew Lozano, M.D., for a follow-up appointment for a rash secondary to her new arthritis medication.  (AR 670-72.)  On September 8, 2011, Plaintiff reported taking more than six Norco per day and wanting to "get off Norco."  (AR 665-66.)  A December 8, 2011, sleep study reflected a diagnosis of "severe obstructive sleep apnea associated with sleep fragmentation and oxygen desaturations."  (AR 680.)

Dr. Rolf G. Scherman, M.D., wrote reports on Plaintiff's status as a "Qualified Injured Worker" on January 22, 2003, and August 31, 2004.  (AR 653-63.)   In his 2003 report, Dr. Scherman opined Plaintiff had "mechanical low back pain" and that she was precluded from heavy lifting.  (AR 653.)  In his 2004 report, based on Plaintiff's return to work with modified duties, Dr. Scherman opined Plaintiff is not a Qualified Injured Worker and is able to perform a modified job and her usual and customary job.  (AR 654.)

Dr. Perminder Bhatia, M.D., a Neuro-Pain Qualified Medical Examiner, treated Plaintiff for low back pain due to her work-related injury and lumbar degenerative disc disease.  (AR 297-336.)  Dr. Bhatia examined Plaintiff on May 18, June 9, and September 7, 2005, and January 9, 2006, for chronic neck pain, back pain, and fibromyalgia.  (AR 487-96.)  On all four occasions, Plaintiff presented with normal behavior and appearance, talk, mood, and content of thought.  She displayed normal tone and 5/5 power in both upper and lower extremities, normal gait, and

restricted movement of the cervicolumbar spine.  Dr. Bhatia continued Plaintiff's Norco and Robaxin prescriptions, added a Lyrica prescription, and added Liboderm patches for her lumbosacral spine.  (AR 487-96.)  A June 9, 2005, EMG report revealed electrical evidence of L4-L5 radiculopathy.  (AR 492.)

Beginning on March 29, 2007, Plaintiff saw Dr. Jenni-Ann Kren, Ph.D., for therapeutic counseling.  Dr. Kren diagnosed Plaintiff as suffering from bipolar I, post-traumatic stress disorder, chronic pain disorder, opioid dependence, fibromyalgia, and low back pain, and created a treatment plan to reduce Plaintiff's depression, anxiety, and post-traumatic stress disorder symptoms.  (AR 633-34.)  Plaintiff showed improvement during April of 2007.  (AR 641.)  On April 27, 2007, Dr. Kren noted that Plaintiff had overdosed on "Elavil" six months prior and had been in the hospital for five days, but there was no psychiatric intervention at that time.  (AR 637.)

On June 1, 2007, Plaintiff complained of pain from fibromyalgia (AR 635) and on June 8, 2007, Plaintiff complained of "kidney pain" that interfered with her sleep (AR 634).  On June 29, 2007, Plaintiff presented "as dysphoric but neatly dressed and well made up," and reported improvement in her nightmares.  (AR 630.)  On August 8, 2007, Plaintiff was very emotional and intermittently tearful.  (AR 630.)  On August 17, 2007, Plaintiff returned to work and presented with an improved mood, and on August 24, 2007, Plaintiff reported adjusting well to her work schedule and sleeping better.  (AR 628-29.)

On September 14, 2007, Plaintiff reported injuring her back doing lawn work and sleeping at work.  (AR 624.)  On October 5, 2007, Plaintiff reported being sad about 4 out of 7 days a week.  (AR 623.)  Between October and November of 2007, Plaintiff worked with Dr. Kren on confronting her behavioral choices and reducing her feelings of being "out of control," and reported high use of her pain medications and trouble sleeping.  (AR 618-19; 621-22.)  From November of 2007 through February of 2008, Plaintiff discussed her troubled relationship with her spouse, and on January 11, 2008, Dr. Kren noted that Plaintiff "[a]ppears to be manipulative in describing self harm."  (AR 611-17.)

On January 17, 2008, Dr. Bhatia noted that Plaintiff's pain had increased and increased her Duragesic patch and Lyrica prescriptions.  (AR 334-35.)  On February 22, 2008, Plaintiff was still

working part time as a security guard, and told Dr. Kren that working aggravated her pain. (AR 608.)   On March 7 and 14, 2008, Plaintiff complained of ongoing sleep difficulties, nightmares, and sleep walking.   (AR 606-07.)   On March 21, 2008, Dr. Kren opined that Plaintiff's "ability to function in [an] employment setting is reduced but as she works less, her ability to function at home is improved."   (AR 604-06.)   On March 28, 2008, Plaintiff told Dr. Kren she was doing poorly and having "a gap in medications caused when pharmacy and MD realized she was taking it at maximum rate prescribed but doctor not writing for enough medications to take that way."   (AR 602.)

On March 31, 2008, Plaintiff was seen for worsening, chronic low back pain and lumbar radiculopathy; Dr. Bhatia noted he had requested a surgical consult for Plaintiff to have surgery "or even pain spinal cord stimulator because she is getting up higher on the pain medications ladder and presently she is taking almost 8 to 10 Vicodin with Norco a day."   (AR 331; *see also* AR 603.)   On examination, her motor strength was 5/5 in both upper and lower extremities and her straight leg raise test was positive on the right side.   (AR 332.)   Dr. Bhatia noted that Plaintiff had epidurals in the past which did not help with her symptoms.   (AR 332.)   Based on Plaintiff's worsening pain, Dr. Bhatia took her off work for three months.   (AR 333.)

On April 4, 2008, Plaintiff told Dr. Kren she was going on disability for back pain and would change to Opana (oxymorphone) for back pain.   (AR 602.)   On April 18 and May 2, 2008, Plaintiff appeared "relaxed and nicely but casually groomed" with good affect during her appointments with Dr. Kren.   (AR 601.)

On May 5, 2008, Dr. Bhatia saw Plaintiff for a follow-up appointment, noting that overall Plaintiff was doing better but was "complaining of right leg weakness which is getting worse" and wanted a surgical consult because she "cannot work and cannot do anything without pain." (AR 329.)   On examination, Plaintiff's motor strength was 5/5 in both upper and lower extremities with normal tone, restricted lumbosacral movement, positive straight leg raise on the right, decreased right knee jerk, and mild weakness in the right quadriceps.   (AR 330.)   On May 30 and June 13, 2008, Plaintiff reported running out of pain medications and withdrawal symptoms, and reported "a couple of black outs (*sic*)" due to "taking high levels of drugs."   (AR 600.)   On June

16, 2008, Dr. Kren called Dr. Bhatia to discuss Plaintiff's medication abuse.  (AR 596; 599.) Plaintiff called Dr. Kren and reported she was "sick" from withdrawal.  (AR 596.)

In a Utilization Review Program decision dated June 18, 2008, Plaintiff was noted as having "persistent back pain" and "more progressive right lower extremity symptomatology," as well as "long standing intermittent right radicular symptoms" supported by "2005 right lower extremity neurodiagnostics [which] showed a right L4-5 radiculopathy."  (AR 325-26.)  In 2007, "epidural steroids were attempted and were stated to not be helpful" and Plaintiff was noted to be on narcotics for the neuropathic and progression pain.  (AR 325.)  A September 2007 MRI showed degenerative changes, but no significant neuroforaminal encroachment was observed.  (AR 325.) Because Plaintiff's "[t]reating physician also request[ed] a concurrent surgical evaluation because of failure for conservative treatment," the reviewing physician ordered an magnetic resonance imaging ("MRI") to determine whether a lesion existed that would warrant surgical intervention. (AR 325.)

On July 11, 2008, Dr. Kren observed Plaintiff's "affect [was] improved" and "bright" and noted Plaintiff was "interactive and talkative."  (AR 595.)  On June 23, 2008, Plaintiff was seen for ongoing pain and given a refill on her Norco prescription.  (AR 323.)  A June 26, 2008, lumbar spinal MRI revealed the following:

> Transitional vertebral body identified and called L5 for the purposes of this dictation.
>
> Decreased disc height, disc desiccation, degenerative marrow changes, anterolateral osteophytes, with a 1-2 mm diffuse disc bulge noted at the L4-L5 level.  The bulging disc does not compress the thecal sac or the adjacent nerve roots.  There is associated mild narrowing of the L4 neural foramina bilaterally.
>
> Mild decreased disc height, mild disc desiccation, anterolateral osteophytes, with 1-2 [mm] diffuse disc bulges noted at the L1-L2 and L2-L3 levels.  No thecal sac or nerve root compression is identified.  There is associated mild narrowing at the right L1 and L2 neural foramina.

(AR 321-22.)

On July 24, 2008, Dr. Bhatia noted that "[s]ince seen last, there are some new developments that as I know she was habituating with her medication and trying to take more than normal."  (AR 318.)  Dr. Bhatia discussed the issue with her, and Plaintiff told Dr. Bhatia that her

husband was in charge of keeping track of and dispensing her medications.  (AR 318.)  Dr. Bhatia discussed the MRI results with Plaintiff, and told her "that there [is] small disc disease but none of them [are] compressing any nerves so [she] should be okay."  (AR 319.)  Plaintiff complained of "tingling" and Dr. Bhatia opined that it "may have been coming from thoracic rami of the paravertebral nerve" and recommended Plaintiff do stretching and prescribed an inversion table to "help her significantly in the pain."  (AR 319.)  Dr. Bhatia noted that she planned to keep Plaintiff off work for about a month, "and then she should be able to go back to work."  (AR 319.)

On July 25, 2008, Plaintiff continued to appear "better" with medication compliance, and reported that she and her spouse were quarreling less.  (AR 593; 595.)  Her blackouts and sleepwalking had also decreased in frequency with compliance with her pain medications.  (AR 595.)  Dr. Kren noted that Plaintiff's most recent MRI "show[ed] improvement in [her] low back and surgery is not indicated."  (AR 593; 595.)  On August 22, 2008, Plaintiff reported "reasonable stability since last seen" and was compliant with her medications.  (AR 591.)  Plaintiff reported "applying for disability and not planning to return to work at the present time," and on September 19, 2008, reported that she was taking care of her grandson without her son's help.  (AR 591.)

On October 3, 2008, Plaintiff complained to Dr. Kren about being overwhelmed with her grandson but during her follow-up appointment on October 17, 2008, Plaintiff reported doing better after deciding to "let go" and after she and her spouse "decided that she will not return to work."  (AR 587.)  On October 15, 2008, Plaintiff complained to Dr. Bhatia of pain at 7 out of 10, and sought a refill of her medications.  (AR 317.)

On November 14, 2008, Plaintiff reported having angry outbursts about five times per day.  (AR 586-87; 589-90.)  On November 20, 2008, Plaintiff called Dr. Kren and reported she "wasn't feeling okay and was very depressed" and the next day, Dr. Kren encouraged Plaintiff to see her primary care physician regarding her chest pain.  (AR 586.)  On December 12, 2008, Plaintiff reported she had stopped taking vitamins and fish oil due to the cost and reported she was no longer sleep walking but was having vivid dreams and awakening in the morning feeling tired.  (AR 585.)

6

On January 13, 2009, Plaintiff was seen for her chronic low back pain, lumbar degenerative changes, and complaints that "she cannot walk much" because she "has pain and feels like her legs are giving away [*sic*]." (AR 314.) Dr. Bhatia reviewed a June 26, 2008, MRI with Plaintiff, which showed "advanced degenerative disc disease and diffuse disc bulge L4-L5 level and L4 neuroforamen bilaterally was narrowed" as well as "disc bulges at L1-L2 and L2-L3." (AR 314.) Dr. Bhatia extended Plaintiff's "off work" status through June 30, 2009. (AR 315.) On January 16, 2009, Plaintiff called Dr. Kren to request an early medication refill and complained that surgery had been ruled out, and she had instead been ordered to go to physical therapy. (AR 585.)

A March 5, 2009, imaging of Plaintiff's chest was normal and unchanged compared to an earlier study. (AR 352; 356.) On February 13 and March 13, 2009, Plaintiff reported blackouts and denied they were caused by her medications. (AR 584.) On March 16 and April 7, 2009, Plaintiff was seen for a refill of her medications and complained of "increased drowsiness" with her Lyrica prescription. (AR 310; 312.) An April 16, 2009, computed tomography study of Plaintiff's chest revealed a likely small focal scar and was otherwise normal. (AR 349-51.)

On April 17, 2009, Plaintiff told Dr. Kren that mortgage assistance and tax relief had reduced her financial stress. (AR 581.) On May 5, 2009, Plaintiff was seen for a refill of her medications and was continued on "off work" status until September 30, 2009. (AR 309.) On May 8, 2009, Plaintiff complained of "poor sleep recently, mood swings and day time drowsiness" but reported "things are going fairly well and she and [her] sp[ouse] are getting along." (AR 579.) On June 5, 2009, Dr. Kren observed that Plaintiff "continues to function fairly well" and that "[s]he has been helped by recent changes in medication and by not having stress [from] employment" (AR 579), while Dr. Bhatia observed Plaintiff to have an increased stress level and appeared agitated, hostile, and confrontational (AR 348). On June 17, 2009, Plaintiff asked Dr. Bhatia for a "note for her to go back to work." (AR 313.) On June 30, 2009, Plaintiff called Dr. Kren, complained of "mood swings and irritability" and asked for a medication refill. (AR 575.)

On July 30, 2009, Plaintiff requested a refill of her medications from Dr. Bhatia, and was continued on Lyrica, Lexapro, and Opana. (AR 306-07.) On July 31, 2009, Plaintiff saw Dr.

1   Kren and complained of being overwhelmed with caring for her grandson and troubled that she

2   and her spouse could not afford to take time off work for rotator cuff surgery.  (AR 574-75; 576-

3   88.)  On September 22, 2009, Plaintiff told Dr. Bhatia she had returned to work despite her pain

4   and requested Dr. Bhatia to increase her dosage of Opana to enable her "to work around and

5   function."  (AR 303.)  Dr. Bhatia increased her dosage, and informed Plaintiff she would be

6   enrolled in a detoxification program as a result of her drug abuse and discussed with her which

7   medications she would be permitted to take during the program.  (AR 304.)

8        On October 2, 2009, Dr. Kren noted that Plaintiff appeared "much better than [in] recent

9   visits" and was looking forward to entering the drug program.  (AR 573.)  Dr. Bhatia examined

10  Plaintiff on October 13, 2009, noting that "she came back early because she was taking more

11  medications than what she was supposed to and she finished her medication early."  (AR 297.)

12  Dr. Bhatia ordered a urine drug screen before refilling Plaintiff's Opana prescription, and the

13  October 14, 2009, urine drug test was positive for cocaine and negative for any other medication.

14  (AR 298; 300.)  As a result of Plaintiff's violation of the pain contract, Dr. Bhatia discharged her

15  from the practice.  (AR 298.)

16       On November 9, 2009, Dr. Richard Guzzetta, M.D., noted as part of the Touchstone

17  Medical Group Chemical Dependency Evaluation that Plaintiff had an eight-year history of

18  abusing pain medications Norco and Opana.  (AR 646.)  Her usage over the past year had

19  escalated to the point where she would run out of medications early and smoke cocaine.

20  (AR 646.)  Dr. Guzzetta reported that Plaintiff had been unemployed for 18 months due to drug

21  use, and continued using Amrix, Lyrica, and Opana.  (AR 646-48.)  Her physical and mental

22  exams were normal, though Dr. Guzzetta noted Plaintiff had poor reliability, insight, judgment,

23  and impulse control.  (AR 651.)  Dr. Guzzetta diagnosed Plaintiff as having opioid dependence,

24  nicotine dependence, and poor social support, relationship, and financial problems.  (AR 651.)

25       On November 18, 2009, Plaintiff called Dr. Kren in a "panic" because her grandchild had

26  been placed in special education.  (AR 572.)  On November 20, 2009, Plaintiff reported her

27  depression at a 10 out of 10 and reported being in "a lot" of pain, but presented wearing makeup

28  and better groomed than she had been in some previous sessions.  (AR 572.)  On December 10,

2009, Plaintiff left a message stating "she had really needed a call but now it was too late, 'What [is] done is done and can't be undone.'"   (AR 572.)   When Dr. Kren returned Plaintiff's call, Plaintiff reported having taken four sleeping pills but refused to give her address so that police could be sent for a welfare check.  (AR 572.)

On December 11, 2009, Plaintiff told Dr. Kren that "she did not want to be hospitalized or participate in [a] treatment program" and denied "that her current distress [wa]s related to substance abuse."  (AR 571.)   On December 18, 2009, Dr. Kren noted that Plaintiff's pain medications had been discontinued with a detoxification program in late November, Plaintiff complained of lacking energy and was "[b]eing evaluated for Lupus [and] Rheumatoid Arthritis, Workers Comp. back injury."  (AR 569; 571.)   From December 2009 through March 2010, Plaintiff was noted to have an increased stress level, depressive symptoms, and moderate to severe mood swings.  (AR 341-42; 345.)

On January 6, 2010, Dr. Kren consulted Dr. Lazaro about Plaintiff's medication, "particularly the monotherapy SSRI with diagnosis of bipolar, and symptoms of mania" and suggested to Dr. Lazaro that Plaintiff be prescribed an anti-psychotic. (AR 567; 568.) On January 7, 2010, Plaintiff complained of headache, denied any cutting, and mentioned her "tendency" toward being "suicidal."  (AR 567.)   On January 11, 2010, Plaintiff reported feeling well (AR 567), and on January 15, 2010, reported losing her temper less often (AR 566).  Plaintiff also complained her prescription for Lyrica had lapsed and she had hurt her back while hiking. (AR 566.)  On January 21, 2010, Plaintiff reported daily headaches and dark thoughts (AR 566), and on February 4, 2010, Plaintiff reported being stable on hydrocodone for her back pain (AR 565).  On February 11, 2010, Plaintiff reported employing "breathing and calming" exercises to calm herself after "an emotional explosion with [her] son" and on February 18, 2010, Dr. Kren observed that Plaintiff "appears to have learned not to escalate fights with [her son]."  (AR 564.)

On February 26, 2010, Plaintiff reported she was "no longer cutting" since her last visit, and her back pain had increased since her fall while hiking.  (AR 562.)  Dr. Kren noted that Plaintiff was "still self-injurious" and had begun drinking after ten years' abstinence.  (AR 563.) Plaintiff also reported feeling that her "psych meds are no longer strong enough" and requested

her dosage be increased.  (AR 560.)  On March 4, 2010, Plaintiff reported improvement and being "less volatile."  (AR 560.)  On March 18 and 25, 2010, Plaintiff was stable but reported having difficulties sleeping.  (AR 559.)  On April 8, 2010, despite a number of stressors including her daughter's illness and a pending pay cut for her spouse, Plaintiff's "affect [wa]s broad with few negative symptoms."  (AR 558.)

On April 20, 2010, Dr. Kren evaluated Plaintiff for state disability and noted she had treated Plaintiff since March 2007, after Plaintiff had attempted to commit suicide.  (AR 363.)  Plaintiff "reported ongoing symptoms of depression, mood instability, angry outbursts, nightmares and sleep walking, anxiety episodes, suicidal ideation[,] and flashbacks to childhood molestation."  (AR 363.)  Dr. Kren noted that after attending the detoxification program, Plaintiff had been placed on Celexa to treat her "self[-]reported depression of 10/10, self[-]injury in [the] form of cutting[,] and [a] lack of motivation to do activities of daily living" and that she was on Risperidone as a mood stabilizer.  (AR 363-64.)  "She improved following this treatment."  (AR 364.)

In April of 2010, Plaintiff was attending weekly individual psychotherapy and voluntarily stopped taking all psychotropic medications, though she continued taking Hydrocodone for pain.  (AR 364.)  Her mood was "more stable" and she is engaged "more effectively in treatment in terms of psychological approaches to her symptoms[,]" however, Dr. Kren opined that Plaintiff

> . . . is unable to hold employment.  She [ha]s limited skills to cope with her mood disorder but these skills are not adequate to handle the stress of employment, particularly if it results in increased pain.  She has difficulty maintaining sustained attention, particularly when experiencing pain.  She is also erratic in interpersonal situations with little tolerance for conflict or confrontations.  She is unable to persist in situations that make physical or emotional demands on her as would be expected in most work settings.  This is a permanent condition and unlikely to improve in the future.

(AR 364.)  On April 22, 2010, Plaintiff "present[ed] as fairly manic, talking fast, [in an] euthymic mood" and "report[ed] that she has not slept in several nights."  (AR 558.)

On April 26, 2010, Plaintiff saw Dr. Himmat S. Gill, M.D., for a pain consultation due to complaints of pain and stiffness involving her hands and ankles and sporadic painful swelling of her hands, knees, and toes.  (AR 426.)  She reported a history of chronic lower back pain,

1   degenerative joint disease, untreated rheumatoid arthritis, and fibromyalgia.  (AR 426.)  Dr. Gill

2   noted Plaintiff had "a strongly positive rheumatoid factor and anti-CCP antibody" indicating

3   "clinically active" rheumatoid arthritis.  (AR 427-29.)

4           On April 26, 2010, Plaintiff also saw qualified medical examiner Dr. Sanjay V. Deshmukh,

5   M.D., for an initial evaluation.  (AR 498-503.)  Plaintiff stated she had sustained an injury on

6   December 28, 2001, while mopping a floor at work.  (AR 498.)  She "felt a sudden pop in her low

7   back" and felt some pain.  (AR 498.)  Then, on December 30, 2001, "she was at work and was

8   reaching to get the keys when she had a sudden onset of spasms in her low back."  (AR 498.)  Her

9   employer sent her to "Concentra," where she was prescribed chiropractic care.  (AR 498.)

10  Plaintiff reported chiropractic care had worsened her symptoms and an epidural steroid injection

11  had not helped with her symptoms.  (AR 498-99.)  Plaintiff complained of constant low back pain

12  at 6 out of 10, with the worst pain at 8 out of 10, radiating to her right posterior thigh and

13  numbness and tingling in both legs to the toes.  (AR 499.)  Bending, walking, sitting, and standing

14  worsened her pain, and changes of activity and mediation helped with her pain.  (AR 499.)  On

15  examination Plaintiff's dorsolumbar spine range of motion was significantly restricted, there was

16  tenderness in her paraspinal muscles, and she was able to walk on her toes and heels with some

17  discomfort.  (AR 501.)  Dr. Deshmukh diagnosed Plaintiff with chronic low back pain and

18  recommended she see a pain management specialist.  (AR 502-03.)

19          On April 30, 2010, Plaintiff reported sleeping poorly and demonstrated "only one episode

20  o[f] poor impulse control when she hit [a] wall after quarrel with [her] sp[ouse] over her desire to

21  resume pain medication."  (AR 556-57.)  On May 7, 2010, Plaintiff "said she was not doing well

22  but was cheerful and talkative in session," reported doing more housework with a commensurate

23  increase in pain, and admitted to taking "excessive" amounts of ibuprofen.  (AR 555.)  On May

24  21, 2010, Plaintiff saw Dr. Kren for a follow-up appointment and reported being "stressed over

25  [her] finances as [her] sp[ouse]'s income continues to decrease" and being in the "process of

26  evaluations for disability."  (AR 555.)

27          On May 8, 2010, Steven Stoltz, M.D., performed an internal medicine evaluation of

28  Plaintiff on behalf of the state disability department.  (AR 365-70.)  Plaintiff complained of disc

disease and arthritis in her spine, as well as both back and bilateral leg pain and a feeling "like she is standing in warm water on a constant basis." (AR 365.)  She reported a history of rheumatoid arthritis and fibromyalgia and on a medical source vendor questionnaire sheet noted she had lupus. (AR 365.)  Plaintiff was diagnosed with bipolar disorder, post-traumatic stress disorder, opiate dependence and borderline personality disorder in a psychiatric evaluation, reported smoking 20 cigarettes each day, and denied alcohol abuse. (AR 365-66.)  On examination, she had no back pain with knee extensions from the seated position, negative straight leg raising signs from the supine position, back pain to simple light touch in the lumbar paraspinal area, and forward flexion at 50 degrees with poor effort. (AR 368.)  She had good tone bilaterally with good active motion, and strength at a 5/5 in all extremities. (AR 369.)  Dr. Stoltz diagnosed Plaintiff with chronic pain syndrome and psychiatric issues, noting that while she suffered from "back and lower extremity pain" there were "no findings whatsoever of any rheumatologic disease such as rheumatoid arthritis, lupus[,] nor fibromyalgia." (AR 370.)

On May 14, 2010, state agency physician Dr. S. Reddy, M.D., opined Plaintiff could lift up to 25 pounds frequently and up to 50 pounds occasionally, and could stand, walk, and sit for about 6 hours in an 8-hour workday.  Dr. Reddy also noted the treatment records did not support the alleged severity of degenerative disc disease or Plaintiff's allegations of degenerative disc disease, lupus, arthritis, and fibromyalgia.  (AR 372-73; 379-80.)  Dr. Reddy identified only one environmental limitation, opining that Plaintiff should avoid concentrated exposure to machinery and heights hazards.  (AR 375.)  Dr. Reddy noted no postural limitations, but concluded that a medium RFC with respiratory precautions was most appropriate and consistent with Plaintiff's activities of daily living given Plaintiff's long history of asthma, morbid obesity, and clinically observed genu valgus deformity of the knees.  (AR 374.)

Dr. Reddy also reviewed the conflicting psychological records, noting Plaintiff's treating physician, Dr. Kren, had opined in a summary letter that Plaintiff "is unable to hold employment due to an inability to cope [with] the stress and that she experiences difficulty maintaining attention, particularly when in pain" but consultative examiner Dr. Murrillo had opined Plaintiff could sustain simple repetitive tasks.  (AR 381.)  Dr. Reddy noted Plaintiff reported a depressed

1  mood that changed from hour to hour and "angry outburst[s]," and therefore concluded her public

2  contact must be limited.  (AR 381.)

3      On May 23, 2010, Dr. Ekram Michiel, M.D., performed a psychiatric evaluation of

4  Plaintiff at the request of the state disability department.  (AR 382-85.)  Plaintiff reported

5  "feel[ing] very depressed and . . . extremely angry."  (AR 382.)  She reported being diagnosed

6  with lupus in San Francisco in 1990, and rheumatoid arthritis and fibromyalgia in 2002.

7  (AR 382.)  She described her depression as worsening since 2005, described herself as "sleeping a

8  lot, eating poorly, crying easily, frustrated easily, mood swings very fast and angry outbursts[,]"

9  and reported cutting herself some years prior.  (AR 382.)  She stated that "because of her angry

10  outbursts she could not continue working" as a security guard.  (AR 383.)  "Probing questions did

11  not reveal manic or hypomanic episodes" during the examination, but Plaintiff reported that her

12  mood changes "from hour to hour."  (AR 384.)  Dr. Michiel opined Plaintiff "is able to maintain

13  attention and concentration and to carry out simple job instructions" and "to relate and interact

14  with coworkers, supervisors and the general public[,]" but cannot "carry out an extensive variety

15  of technical and/or complex instructions."  (AR 384.)

16      On May 28, 2010, Dr. Kren noted Plaintiff had still not seen a pain specialist and was still

17  abstaining from narcotics, but was "'managing' fairly well."  (AR 555.)  Plaintiff saw Dr. Gill on

18  June 7, 2010, and complained of general body ache.  (AR 424.)  On June 11, 2010, Plaintiff was

19  "cheerful" in an appointment with Dr. Kren, though she was worried her spouse might be laid off

20  of work.  (AR 554.)  On June 18, 2010, Plaintiff saw Dr. Kren and appeared "cheerful and in little

21  distress" and reported improved sleep, being "more active" and "able to avoid angry outbursts,"

22  and having reduced stress after learning her spouse would not be laid off.  (AR 553.)  On July 5,

23  2010, Dr. Kren noted Plaintiff had poor impulse control, uneven compliance with her medication,

24  and improved – though still unstable – mood.  (AR 551; 552; 553.)  Plaintiff requested biweekly

25  sessions "because of [her] inability to afford more copays."  (AR 553.)

26      On July 10, 2010, medical consultant Dr. E. Murillo, M.D., completed a psychiatric review

27  technique form, opining Plaintiff suffered from mood disorder, NOS, and post-traumatic stress

28  disorder.  (AR 386-90.)  Dr. Murillo opined Plaintiff was mildly limited in her activities of daily

living and ability to maintain concentration, persistence, and pace, moderately limited in her

ability to maintain social functioning, but that there was insufficient evidence to determine

whether she had experienced repeated episodes of decompensation.  (AR 394.)  Dr. Murrillo

completed a mental RFC assessment, opining Plaintiff was moderately limited in her ability to

understand, remember, and carry out detailed instructions.  (AR 397-99.)

On July 23, 2010, Plaintiff told Dr. Kren she was "in considerable pain" and was

experiencing "numbness" on the soles of her feet.  (AR 550.)  She had "been turned down by SSI

and [had] engaged an attorney."  (AR 550.)  Plaintiff reported her energy level and mood varied

rapidly, but she had had some success in controlling her temper.  (AR 550.)  Plaintiff complained

to Dr. Gill on August 2, 2010, of pain in her feet, morning stiffness and backache, and positive

synovitis was noted in her left ankle.  (AR 422-23.)  On August 6, 2010, Plaintiff

> . . . said she was stressed almost to [the] point of aggression.  She was 5 days off
> of Risperdal because of lack of money to pick up [her prescription].  She said she
> kept herself from blowing up but she was very angry and "anxious" much of [the]
> time.  She was also mildly manic, for example she folded "six month's" worth of
> clean laundry.

(AR 550.)  Dr. Kren guided Plaintiff in calming herself during their session, and coached Plaintiff

on using this technique periodically throughout the day.  (AR 550.)

A lumbar spine MRI on August 17, 2010, revealed mid disc desiccation without narrowing

and a 1-2 mm diffuse disc bulge without compression of the thecal sac or adjacent nerve roots at

L1-L2, L2-L3, and L4-L5.  (AR 443-44.)  Compared with the June 26, 2008, lumbar spine

imaging, no significant interval change was noted.  (AR 444.)   On September 17, 2010, Plaintiff

called Dr. Kren and said she was "tired" and "going to take [a] break from treatment."  (AR 548.)

Plaintiff saw medical examiner Dr. John F. Petraglia, M.D., on September 27, 2010, for

her back pain and injury.  (AR 440-42.)  She described her disabling lower back injury as a sharp

pain across her lower back followed by numbness.  (AR 440.)  She continued working for another

five years after the initial back injury and treatment for lower back pain.  (AR 440.)  The August

2010 MRI was reviewed.  (AR 437; 440.)  Dr. Petraglia did not observe any significant changes

from the June of 2008 MRI.  (AR 437; 440.)  She described her pain as maintained at an average

of 7-8 on a scale from 1-10, and described it as "aching, tingling, severe, stabbing, shooting, tight,

annoying, numbing, constant, burning, hot[,] and unbearable." (AR 440.) She described her pain as diffuse throughout the lower back and extending through the right sciatic region and down her right leg, and complained the pain is worsened by "sitting, walking, standing, bending, lifting, and lying down, driving, stress and sexual intercourse." (AR 434; 440.) Plaintiff told Dr. Petraglia she smoked a pack of cigarettes a day and denied alcohol and illicit drug use. (AR 437; 440.)

On examination, her cervical range of motion was 70% of normal and her lower extremities range of motion varied from 65-80%, and her gait was antalgic. (AR 441-42.) Examination of her lumbar spine revealed "diffuse tenderness and spasm throughout the thoracal lumbar region" and "touch sensitivity at the lumbar facets and at the sacroiliac regions." (AR 441.) Dr. Petraglia also noted right-side sciatic nerve tenderness corresponding with sciatic notch irritation. (AR 441.)

On October 6, 2010, Plaintiff saw Dr. Gill for follow-up laboratory work and heel to knee pain. (AR 420.) Plaintiff saw Dr. Petraglia on October 15, 2010, for a workers compensation reevaluation. (AR 437-39.) On examination, her cervical range of motion was 70% of normal and her lower extremities range of motion varied from 65-80%, and her gait was antalgic. (AR 438-39.) Dr. Petraglia recommended increasing her pain medication and prescribed Lyrica for her neuropathic pain, a TENS unit, and Medrox. (AR 439.) On October 28, 2010, Plaintiff called Dr. Kren and reported having "panic attacks." (AR 548.) On November 5, 2010, Plaintiff told Dr. Kren that "[s]he continues to have problems with medication continuity and has to go in to MD for 'drug counseling.'" (AR 548.)

On December 2, 2010, Plaintiff had a follow-up pain management consultation with medical examiner Dr. Petraglia. (AR 434-46.) She reported "a decreasing severity of symptoms" with medication, but noted "continued low back pain, knee, and ankle pain as well as fatigue . . . irritability, sleep interruptions and moodiness." (AR 434.) On examination, her cervical range of motion was 70% of normal and her lower extremities range of motion varied from 65-80%, and her gait was antalgic. (AR 435.) Dr. Petraglia noted diagnostic impressions of lumbar degenerative disc disease with stable course, history of smoking, sleep disorder, myofascial pain, and a work related injury with persistent lower back pain, managed conservatively with

1    medications and conservative care.  (AR 436.)  Dr. Petraglia also recommended a back brace,

2    continuing use of her medications, TENS unit, a home exercise program, and Medrox, and starting

3    Plaintiff on Celexa and Risperadone to treat her depression and sleep issues.  (AR 436.)

4         On December 10, 2010, agency reviewing physician Dr. Graciano reviewed the medical

5    record on reconsideration and affirmed an RFC limiting Plaintiff to simple, repetitive tasks with

6    limited public contact.  (AR 446-47.)  On December 2, 2010, Plaintiff rated her pain at a 5-8 out of

7    10 and reported a decreasing severity of symptoms.  (AR 473-82.)  On December 3, 2010,

8    Plaintiff reported increased depression, and Dr. Kren noted "uneven compliance" with her

9    medications as a result of "severe financial issues."  (AR 546; 547.)  On December 30, 2010,

10   Plaintiff saw Dr. Petraglia for a medication refill and increased back pain.  (AR 462.)  She rated

11   her pain as being stable at an 8-9 out of 10 and requested additional pain medication to control her

12   symptoms.   (AR 465.)   Plaintiff reported using a back brace when driving or sleeping and

13   improvements in her back pain when lying on her side or with icing and massage.  (AR 465.)

14        On January 28 and February 24, 2011, Plaintiff was seen for a follow-up with Dr.

15   Petraglia.  (AR 449-61.)  She rated her pain at a 5-8 out of 10, noted a decrease in severity of

16   symptoms, asked for long acting medications, and reported low back pain, knee, and ankle pain as

17   well as fatigue.  (AR 449.)  On examination, her cervical range of motion was 70% of normal, her

18   lower extremities range of motion varied from 65-80% of normal, and examination of the lumbar

19   spine revealed diffuse tenderness and spasm throughout the thoracal lumbar region, touch

20   sensitivity at the lumbar facets and at the sacroiliac regions, and sciatic nerve tenderness on the

21   right side extending through the right leg.  (AR 450.)  On April 20, 2011, during a follow-up with

22   Dr. Petraglia, Plaintiff rated her pain as a 6-8 out of 10, reported a decrease in severity of

23   symptoms, and low back, knee, and ankle pain.  (AR 510-12.)  Her lower extremities range of

24   motion remained limited. (AR 511.)

25        On May 18, 2011, Plaintiff tested positive for cocaine and benzoylecgonine (the primary

26   metabolite of cocaine use), opiates, hydrocodone, and hydromorphone.  (AR 518-20.)  Plaintiff

27   reported her pain as being stable at a 5-8 out of 10 and a decreasing severity of symptoms, noted

28   continuing low back pain, knee and ankle pain, and fatigue, and described her pain as "aching,

tingling, severe, stabbing, shooting, tight, annoying, numbing, constant, burning, hot and unbearable." (AR 505.) Plaintiff complained of diffuse lower back pain extending through the right sciatic region and down her right leg, and reported a history of her knee giving way under her weight. (AR 505.)

On June 16, 2011, Plaintiff reported her pain as being stable at a 5-8 out of 10 and a decreasing severity of symptoms to Dr. Petraglia. (AR 529.) She continued to experience a limited range of motion in her lower extremities and diffuse lower back pain radiating down her right leg. (AR 529-30.) On June 29 and July 29, 2011, Plaintiff again tested positive for cocaine and benzoylecgonine (the primary metabolite of cocaine use), opiates, hydrocodone, and hydromorphone. (AR 514-16; 537-39.) On August 25, 2011, Plaintiff tested positive for cocaine and benzoylecgonine but not for opiates, despite reporting to the testing physician that she was taking opiates. (AR 533-35.) Plaintiff was also seen by psychologist Dr. Fraser and Dr. Petraglia for a follow-up on "neurobehavioral intervention in compliance" and pain management. (AR 523-25; 526-28.) Plaintiff reported her pain as being stable at 6 out of 10, reported successful pain management using Norco and Lyrica, and noted an overall decrease in severity of symptoms. (AR 523; 526.) Dr. Petraglia recommended Plaintiff continue her current medications and attend support meetings for drug use guidelines. (AR 525; 528.)

Dr. Kren completed a Psychotherapy Pre-Certification Request on June 10, 2011, noting Plaintiff was "uneven" in her compliance and scheduling of medications and needed to develop strategies to deal with breaks in her medications aside from resorting to illegal drugs. (AR 544; 545.) On October 28, 2011, Dr. Kren identified problems with "somatic preoccupation, CBT, pain management techniques, relaxation techniques, [and] pacing," and noted Plaintiff had "discontinued all medications in last two months." (AR 542-43.) Dr. Kren noted Plaintiff needed "to learn to use coping strategies in [the] absence of medications." (AR 542-43.)

**B.**     **Written Testimony**

   **1.**     **Plaintiff's Adult Disability Form**

In her Adult Disability Form completed on March 5, 2010, Plaintiff wrote that on a normal day she wakes up at 7:00 a.m. and watches television before making breakfast. (AR 227; 231.)

She "straighten[s] up" the kitchen and does laundry, helps to take care of her dog, and will go outside and sit in the backyard or "lay down for a while." (AR 227.) Three days every other week, she plays with her young grandson after he comes home from school. (AR 227.) She has trouble sleeping due to her pain and medication. (AR 228.) She is able to dress herself but needs help picking out outfits, can bathe by herself but will forget to brush her hair, and can use the toilet without assistance. (AR 228-29.) Plaintiff prepares cold meals like sandwiches and cereal because she tends to forget she is cooking and ends up burning food. (AR 229.)

Plaintiff is able to load a dishwasher but forgets to add soap or turn the dishwasher on, and is able to do laundry but forgets to put the clothes in the dryer. (AR 229.) She "do[es]n't need help or encouragement" to do these chores, but does "need to be reminded" by her husband. (AR 229.) Plaintiff is able to drive a car and use public transportation by herself, and goes grocery shopping every other day for a half hour. (AR 330.) She is able to pay bills and count change, but "can't keep track of the accounts and figures." (AR 230.) She watches television and reads books, but has difficulty remembering story lines and has to re-read things "just to remember where [she] left off." (AR 231.) She speaks with friends on the phone once or twice a week, and attends movie theaters, family birthdays, and holiday "get togethers." (AR 231.)

Plaintiff has difficulty communicating with family, friends, and neighbors, noting she becomes "angry when [she] can't make people understand what [she's] trying to say." (AR 232.) She becomes "uncomfortable and short tempered" when she is made "to stay in one place." (AR 232.) Plaintiff noted her impairments affect her ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, talk, reach, concentrate, complete tasks, remember, understand, follow directions, get along with others, and use her hands. (AR 232-34; 260; 276.) She can pay attention for five minutes or more depending on her physical condition, and does not follow spoken instructions well or written instructions quickly. (AR 232.) She doesn't handle stress well and "tend[s] to challenge" authority figures "because [she] do[es]n't understand." (AR 233.) She uses a walker and wheel chair as needed but has never been prescribed either device. (AR 233.)

//

//

18

### 2.      Plaintiff's Work History Report

Plaintiff listed four jobs in her 15-year work history, as a laborer for a temp agency, a security guard for a private security firm, a janitor for County facilities, and a janitor for a convention center.  (AR 235.)  Her job duties as a laborer included "digging ditches" and "factory work," and she was frequently required to lift up to 25 pounds.  (AR 236.)  As a security guard, she "worked at different sites from construction sites to stores and . . . a food plant."  (AR 237.) She always lifted less than 10 pounds, and would walk, stand, and sit 1.6 total hours each day. (AR 237.)  As a janitor with the County and with the convention center, Plaintiff cleaned various rooms and lifted and carried vacuums, mops, brooms, and cleaning supplies, and was required to kneel, crouch, crawl, and handle large and small objects throughout the day.  (AR 238-39.)

### 3.      Third Party Adult Function Report

In his April 5, 2010, third-party adult function report, Plaintiff's husband Oscar Alcantar wrote that on an average day, Plaintiff will "try to do some lite [*sic*] housework, watch TV, [and] do some reading" but is "constantly falling asleep."  (AR 247.)  She takes care of her young grandson after he gets home from school and feeds and plays with their dog.  (AR 248.)  Mr. Alcantar wrote that "the pain doesn't allow [Plaintiff] to sleep through the night" and her medications cause "nightmares and sleep walking."  (AR 248.)  She is able to bathe, feed, and dress herself, but needs help picking appropriate clothing and needs to be reminded to brush her hair.  (AR 248-49.)

Plaintiff prepares simple food each day, such as cereal, oatmeal, and sandwiches, and "if distracted, she'll forget she's cooking."  (AR 249.)  She does laundry, dishes, light dusting, and will babysit, and "needs constant reminding and supervision" because she "forgets her limitations and tends to overdo it to the point of aggravating her condition."  (AR 249.)  Mr. Alcantar noted Plaintiff "is unable to stand or walk for more than a few minutes [and] can't move her torsoe [*sic*] in order to vacuum."  (AR 250.)  She is able to drive by herself and goes grocery shopping with a shopping list he prepares.  (AR 250.)

Mr. Alcantar noted Plaintiff used to "go on walks, ride bikes, swim, help the neighbors, [and was] very involved in school activities."  (AR 251.)  Now, she reads, watches television, and

1    plays with her grandson, talks on the phone daily, and visits with friends every one or two weeks.

2    (AR 251.)  She needs supervision for events lasting longer than an hour and tends to "shy away"

3    from large groups.  (AR 251-52.)  He reiterated the limitations Plaintiff identified in her adult

4    function reports and noted Plaintiff becomes "very agitated" when anyone "impos[es] guidance or

5    direction to her [*sic*]."  (AR 252-54.)

6    **C.      Hearing Testimony**

7          **1.      Plaintiff's Testimony**

8          Plaintiff testified she had been disabled since March of 2008, when she worked security.

9    (AR 61.)  She mainly worked security in stores at night because she preferred to work the

10   "quieter" night shift.  (AR 62.)  She stopped working because she fell at a construction site and

11   injured her leg.  (AR 62.)  Plaintiff attended high school through the 11th grade, and though she

12   did not have any difficulty with reading or writing, she never received a GED or high school

13   equivalency diploma.  (AR 65.)  She has two adult children, and shares custody of her grandson

14   with her son and ex-daughter-in-law.  (AR 63-64.)  Plaintiff takes her grandson to school and

15   feeds him for five days every other week.  (AR 64.)

16         Plaintiff testified she has a bulging disc in her lower back and two compressed discs,

17   sciatic nerve damage in both her legs that keeps her from standing or sitting too long at a time,

18   lupus, and rheumatoid arthritis.  (AR 67.)  She can only sit twenty minutes at a time, and cannot sit

19   through a half-hour television show without having to stand up and move around to relieve her

20   discomfort.  (AR 67-69.)  She does dishes, cooks, and does "light cleaning," but is unable to move

21   a vacuum cleaner without hurting her back.  (AR 69.)  She cannot bend over to pick something off

22   the floor, and must lean on something in order to sit down on the floor or get up off the floor.

23   (AR 70.)  She can only lift eight to ten pounds at a time, and can only lift about five pounds

24   repeatedly.  (AR 81.)

25         Plaintiff can independently take care of her personal needs like getting dressed and using

26   the bathroom, is able to drive, and is able to do some limited shopping by herself.  (AR 70-71.)

27   She has occasional difficulties using her fingers and hands due to her arthritis and fibromyalgia,

28   where she is unable to close her fists because they swell painfully (AR 71-72).  The symptoms are

1    transient, however, and exercise helps to relieve the pain and swelling.  (AR 73.)

2        Plaintiff testified about her history of drug use and emotional issues, stating she would use

3    up her prescriptions, run out, and experience drug withdrawal symptoms.  (AR 73-74.)  She stated

4    that her use of cocaine helped "to counteract the pain medication" so she "wouldn't be so tired and

5    dragging[.]"   (AR 74-75.)   Although she tested positive for cocaine a few months before the

6    hearing, Plaintiff stated she was not a daily cocaine user and had quit using cocaine in November

7    2011, after attending a four-day in-hospital detoxification program.  (AR 74-75.)

8        Plaintiff has attempted suicide more than once, most recently five years prior to the

9    hearing, when she took "63 Elavil" and cut herself.  (AR 79.)  She had cut herself as recently as a

10   month before the hearing.  (AR 79.)   She continues to see a psychologist once a month and speak

11   to her on the phone occasionally, and deals with her depression and anxiety by "just kind of

12   work[ing] through them."  (AR 75-76.)  She noted improvements with her anger management, and

13   said she is working with her psychologist to meditate and do breathing exercises "when things get

14   crazy."  (AR 77.)  Plaintiff sleeps between taking her grandson to school at 8:30 a.m. and picking

15   him up at 2:00 p.m. (AR 81), and sleeps for about two hours at a time before having to "get up and

16   move around" (AR 69).   She has "very poor judgment when it comes to being around a lot of

17   people," and feels she can be talked into doing "anything."  (AR 81.)

18       **2.      Vocational Expert's Testimony**

19       The vocational expert ("VE") testified at the hearing that Plaintiff had prior relevant work

20   experience as a security guard, Dictionary of Occupational Titles ("DOT") 372.667-034, light

21   work with an SVP[2] level of 2[3]; as a janitor, DOT 382.664-010, medium work with an SVP of 3[4];

22   as a stores laborer, DOT 932.687-058, medium work with an SVP level of 2; and as a construction

23

---

24   [2]   Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a
typical worker to learn the techniques, acquire the information, and develop the facility needed for average
25   performance in a specific job-worker situation.

26   [3]   Level 2 Reasoning requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved
written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized
situations."  DOT, App. C, 1991 WL 688702.

27   [4]   Level 3 Reasoning requires the ability to "[a]pply commonsense understanding to carry out instructions furnished
in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from
28   standardized situations."  DOT, App. C, 1991 WL 688702.

laborer, DOT 869.687-026, heavy work with an SVP level of 2.  (AR 83.)

The ALJ asked the VE whether a person "limited [ ] generally to light exertion, but [ ] also compelled to sit and stand throughout the course of a work day . . . . [where] the person can sit or stand for about a half an hour and can finish a short task before that person has to get up or sit down, but ultimately they do have to be able to sit and stand about equal amounts throughout the course of the work day" would be able to perform any of Plaintiff's prior relevant work.  (AR 83.) The VE testified that "[i]f the assignment were to work as a gate guard where they have that single station to work in, I can imagine a person doing this type of work or being able to work within this hypothetical" but "[t]hat is a fraction of the entire number of security guard jobs."  (AR 84.)  The VE did not testify how many such positions exist within the local or national economy.  (AR 84.)

The ALJ posed a second hypothetical, with the additional restriction to no more than occasional fingering and handling.  (AR 84.)  The VE testified that "loss of hand function . . . makes a big difference in terms of the[ ] ability to return to work" because "most of the labor market is closed to a person with unskilled capabilities and occasional use of the hands and fingers."  (AR 84-85 ("the jobs that are left are so few in number [that] I wouldn't enumerate them").)

**D.     Administrative Proceedings**

On March 28, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (AR 39-48.)  The ALJ found Plaintiff had two severe impairments, lumbar degenerative disc disease and a history of substance abuse.  (AR 41.)  The ALJ evaluated Plaintiff's diagnoses of bipolar disorder I and borderline personality disorder, but concluded after reviewing the medical evidence that these medically determinable impairments had not been established as "severe."  (AR 41.)  The ALJ then determined that Plaintiff's impairments, singly and in combination, did not meet or equal a listed impairment.  (AR 43-44.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the limitations that she can only occasionally stoop, crouch, and crawl, and requires the option to alternate between sitting and standing every 30 minutes.  (AR 44-48.)

//

22

1     Given this RFC, the ALJ found Plaintiff was capable of performing the requirements of

2  representative occupations "gate guard" and "lobby guard," which are subsets of the security

3  guard occupation (DOT code 372.667-034).  (AR 48.)  The ALJ concluded that Plaintiff was not

4  disabled, as defined in the Social Security Act, from March 30, 2008, the alleged onset date,

5  through September 30, 2011, the date last insured.  (AR 48.)  Plaintiff appealed the ALJ's decision

6  and submitted additional medical evidence to the Appeals Board on May 8, 2012 (AR 31-32); the

7  appeal was denied on December 11, 2013, making the ALJ's decision final (AR 1-7).

8  **E.     Plaintiff's Complaint**

9     On February 9, 2014, Plaintiff filed a complaint before this Court seeking review of the

10  ALJ's decision.  (Doc. 1.)  Plaintiff argues the ALJ improperly rejected the opinions of Plaintiff's

11  treating psychologist, improperly evaluated Plaintiff's diagnosed impairments, and improperly

12  rejected Plaintiff's and Plaintiff's husband's testimony.  (Docs. 16; 18.)

13                          **III.   SCOPE OF REVIEW**

14     The Commissioner's decision that a claimant is not disabled will be upheld by a district

15  court if the findings of fact are supported by substantial evidence in the record and the proper legal

16  standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007);

17  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v.*

18  *Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d

19  323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*,

20  161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the

21  findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.)

22     Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Ryan v.*

23  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521

24  (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

25  support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison*

26  *Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute

27  substantial evidence, only those 'reasonably drawn from the record' will suffice."  *Widmark v.*

28  *Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of*

*Health & Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.")   The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).   "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."); *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive).   The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'"   *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

1   1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

2   impairments must result from anatomical, physiological, or psychological abnormalities that are

3   demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

4   such severity that the claimant is not only unable to do his previous work, but cannot, considering

5   his age, education, and work experience, engage in any other kind of substantial, gainful work that

6   exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

7        The regulations provide that the ALJ must undertake a specific five-step sequential

8   analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the

9   claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),

10  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

11  impairment or a combination of impairments significantly limiting her from performing basic

12  work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines

13  whether the claimant has a severe impairment or combination of impairments that meet or equal

14  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is

15  therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must

16  determine whether the claimant has sufficient RFC despite the impairment or various limitations

17  to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the

18  Commissioner to show that the claimant can perform other work that exists in significant numbers

19  in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or

20  not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v.*

21  *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

22                          **V.   DISCUSSION**

23  **A.      The ALJ's Evaluation of the Medical Evidence**

24       Plaintiff contends the ALJ improperly rejected, in whole or in part, the opinions of mental

25  health physicians Drs. Kren, Guzzetta, Murillo, and Michiel.   (Doc. 16, pp. 17-18.)   Plaintiff

26  further argues the ALJ erred by ignoring Plaintiff's medically determinable rheumatoid arthritis,

27  myofascial pain syndrome, and lumbar facet syndrome at Step 2 of the sequential analysis.

28  (Doc. 16, pp. 19-20.)   The Commissioner responds that substantial evidence supports the ALJ's

evaluation of both the medical opinion evidence and Plaintiff's physical impairments.  (Doc. 17, pp. 7-9.)

### 1.   The ALJ's Assessment of the Medical Evidence Regarding Plaintiff's Alleged Mental Impairments

Plaintiff asserts the ALJ failed to state specific and legitimate reasons for rejecting treating physicians Dr. Kren's opinion and for rejecting or wholesale ignoring without explanation the opinions of one-time examining physicians Drs. Guzzetta, Michiel, and Murrillo.  (*See* Doc. 16.) The Commissioner contends that substantial evidence in the record supports the ALJ's assessment of the medical opinion evidence of Plaintiff's mental impairments.  (*See* Doc. 17.)

#### a.   Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id*.

Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  *Id*.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

//

//

**b.      The ALJ Stated Legally Sufficient Reasons for Rejecting Dr. Kren's Medical Opinion**

Through her last date insured, September 30, 2011, the ALJ concluded that Plaintiff's diagnosed bipolar disorder I and borderline personality disorder did not cause any more than minimal limitation in Plaintiff's ability to perform basic mental work, and therefore the conditions were nonsevere.  (AR 41.)   The ALJ considered Dr. Kren's ongoing treatment of Plaintiff since March 2008, prior to Plaintiff's alleged onset date.  (AR 41-42.)   The ALJ noted that Dr. Kren's diagnoses were inconsistent with her repeated observations that when compliant with her medications, Plaintiff's symptoms improved:

> . . . In an April 20, 2010, report by Dr. Kren, she stated that [Plaintiff] had severe symptoms when first seen in March 2007, that somewhat resolved or stabilized with medications and therapy[ ] [citation omitted].  She wrote that [Plaintiff] is diagnosed with a bipolar I disorder, a posttraumatic stress disorder, opioid dependence, and a borderline personality disorder.  Dr. Kren assessed a GAF of 55 to 60, indicating moderate to mild symptoms, but contradictorily then went on to opine that the claimant could not sustain the stress of regular work.

> Based on the treatment[ ] notes summarized above, I reject Dr. Kren's opinion that the claimant could not sustain the stress of regular work because it is inconsistent with Dr. Kren's own treatment notes and she did not discuss the effects of [Plaintiff]'s admitted drug use and overuse of her prescribed medications.

(AR 42.)

Plaintiff asserts the ALJ impermissibly rejected Dr. Kren's medical opinion based on a single Global Assessment Functioning ("GAF")[5] score assigned the year prior to her April 2010 evaluation and mischaracterized it as indicating only "moderate to mild" symptoms.  (Doc. 16, pp. 14-15.)   The ALJ relied on Dr. Kren's opined GAF score as inconsistent with Dr. Kren's opinion that Plaintiff – despite repeatedly demonstrating that her symptoms were responsive to medication and therapy – was incapable of regular work.  (AR 42.)   Plaintiff contends that this single score is not indicative of the overall record, because Dr. Kren's treatment notes contain multiple GAF

---

[5]      The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 41 and 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning.  *Id.* at 32.

scores "firmly in the moderate range," and regardless "the GAF scores assessed by Dr. Kren are less probative than her more precise articulation of Plaintiff's limitations" in her evaluation. (Doc. 16, p. 15.)   However, the ALJ did not base his discounting of Dr. Kren's opinion on a single inconsistent GAF score alone – the ALJ noted Dr. Kren's own records revealed that Plaintiff's symptoms responded to medication.   (AR 42; *see also* AR 583; 584; 587; 590; 591; 593; 595.) The ALJ properly accorded weight to Dr. Kren's opinion based on the degree to which her opinion that Plaintiff was unable to sustain regular work was consistent with and supported by the overall record – a record that indicated Plaintiff is indeed capable of regular work *when she is compliant with her medication*.   *See* 20 C.F.R. §§ 404.1527(c)(3), (4).   *See Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits").

Plaintiff further argues that any inconsistency within Dr. Kren's treatment notes is easily explained because "Plaintiff's signs and symptoms varied, depending on what phase of her Bipolar she was experiencing" (Doc. 16, p. 14; *see* Doc. 16, p. 16 (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("the very nature of bipolar disorder is that people with the disease experience fluctuations, so any single notation that a patient is feeling better or has had a 'good day' does not imply the condition has been treated")).)   The ALJ, however, did not reject Dr. Kren's opinion because *Plaintiff's symptoms* were inconsistent.   (*See* AR 42.)   The fact that Plaintiff's affect and mood varied from examination to examination was not the basis of the ALJ's rejection of Dr. Kren's opinion; the ALJ rejected Dr. Kren's opinion as internally inconsistent because Dr. Kren repeatedly opined *Plaintiff's symptoms improved when she was compliant with her medication*, and rejected Dr. Kren's opinion as incomplete because Dr. Kren never discussed the impact of Plaintiff's substance abuse issues on her diagnoses.   (*See* AR 42.)

Plaintiff responds that "although some of Dr. Kren's treatment notes may support some improvement with treatment, this is an invalid reason for rejecting Dr. Kren's opinion." (Doc. 16, p. 22 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (evidence of "some improvement" with psychiatric treatment does not mean mental impairment no longer seriously affected claimant's ability to work)); *Carlson v. Shalala*, 841 F. Supp. 1031, 1038 (D. Nev. 1993)

1  (periods of remission on psychotropic medications do not show improvement in claimant's ability

2  to work).)   When considering symptoms of mental disorders, "[r]eports of 'improvement' in the

3  context of mental health issues must be interpreted with an understanding of the patient's overall

4  well-being and nature of [his] symptoms."  *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir.

5  2014).   Mental health treatment notes must be "interpreted with an awareness that improved

6  functioning while being treated and while limiting environmental stressors does not always mean

7  the claimant can function effectively in the workplace."  *Id.*   Further, exercising caution in

8  inferring from treatment notes that a claimant is able to work is "especially appropriate when no

9  doctor or other medical expert has opined, on the basis of a full review of all relevant records, that

10  a mental health patient is capable of working or is prepared to return to work."  *Id.*

11        The ALJ noted Dr. Kren had written a report three years into her treatment of Plaintiff and

12  had opined that Plaintiff "improved" following treatment with Celexa for her depression and self-

13  injury and with Risperidone as a mood stabilizer.  (AR 42; *see* AR 363-64.)  Plaintiff had been

14  attending weekly individual psychotherapy and had improved enough to *cease* taking psychotropic

15  medications.  (AR 364.)  According to Dr. Kren, Plaintiff's "mood appears to be more stable than

16  in [the] past and she is engaging more effectively in treatment in terms of psychological

17  approaches to her symptoms" but, despite gaining "limited skills to cope with her mood disorder[,]

18  [ ] these skills are not adequate to handle the stress of employment, particularly if it results in

19  increased pain."  (AR 364.)  When viewed in comparison with the rest of Dr. Kren's treating notes

20  indicating that Plaintiff was improving with both medication and with psychotherapy, it is

21  apparent that Plaintiff's impairments were responsive to, and improved with, treatment.  (*See*

22  AR 42.)  The ALJ permissibly pointed to this internally inconsistent evidence as contributing to

23  his discounting of Dr. Kren's opinion that Plaintiff is disabled.

24        Plaintiff finally objects that the ALJ should have "develop[ed] the record by obtaining a

25  psychiatric review of Dr. Kren's treatment records."  (Doc. 16, p. 25.)  However, Plaintiff points

26  to no conflict or insufficiency in the medical record that would require the ALJ to seek

27  clarification from the physicians who had treated Plaintiff in the past.  The ALJ's duty to recontact

28  a medical source or order a review of that source's records is only triggered where the medical

1   record is insufficient to make a disability finding or the evidence conflicts to the extent that the

2   ALJ cannot reach a conclusion.  20 C.F.R. §§ 404.1512(e), 416.912(e) ("When the evidence we

3   receive from your treating physician or psychologist or other medical source is inadequate for us

4   to determine whether you are disabled, we will need additional information to reach a

5   determination or a decision."); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); *see also Mayes v.*

6   *Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  Plaintiff does not point to any conflict or

7   insufficiency in the medical record that would require the ALJ to seek clarification from the

8   physicians who had treated Plaintiff in the past; Plaintiff argues that because examining physician

9   Dr. Michiel and consulting physician Dr. Murillo did not review all of Dr. Kren's treating notes,

10   the ALJ was under a *sua sponte* duty to retain a psychiatric review of Dr. Kren's treatment

11   records.  That argument misstates the ALJ's duty.

12        The medical records from Plaintiff's previous psychiatric providers were before the ALJ

13   for consideration.  Plaintiff is essentially arguing that upon receiving records from physicians who

14   had treated her in the past and although the medical evidence of record was clear and provided

15   sufficient evidence to decide the claim, the ALJ was under a *sua sponte* duty to solicit an

16   additional and unnecessary review of those physicians' notes and opinions.  "There simply is no

17   such duty to collect further evidence absent inconsistency, conflict, or a lack of evidence in the

18   medical record such that additional or supplement medical evidence is necessary to make a

19   decision on the claim."  *Jewell v. Astrue*, No. 1:09-CV-0348-SKO, 2010 WL 3238849, at *6 (E.D.

20   Cal. Aug. 12, 2010).

21        In sum, the ALJ articulated legally sufficient reasons for discounting Dr. Kren's opinion.

22           **c.**     **The ALJ Accorded Appropriate Weight to Dr. Guzzetta's Opinion**

23        Plaintiff asserts that while the ALJ "apparently gave significant weight" to Dr. Guzzetta's

24   opinion, "the ALJ ignored the GAF score of 45 assessed by Dr. Guzzetta, which indicates

25   Plaintiff's mental functioning was seriously impaired."  (Doc. 16, pp. 17-18.)  The ALJ discussed

26   Dr. Guzzetta's findings from a November 2009 chemical dependency evaluation, where Plaintiff

27   denied any history of suicide or suicidal ideation, contrary to her reports to Dr. Kren.  (AR 43.)

28   Plaintiff also denied any muscle or joint problems, contrary to her assertion that she has constant

1  back pain, and denied using cannabis, cocaine, or amphetamines "despite other evidence to the

2  contrary."  (AR 43.)  Dr. Guzzetta noted that Plaintiff sat calmly through the interview, was

3  awake, alert, and oriented, had average to above average intelligence, no evidence of psychotic

4  symptoms, and showed poor insight and judgment.  (AR 43.)

5       Plaintiff argues that the ALJ erred by failing to discuss the impact of Dr. Guzzetta's single

6  assessed GAF score on Plaintiff's ability to work.   GAF scores, however, are not reliable

7  indicators of a claimant's ability to perform sustained work and may not be relied upon, alone, to

8  indicate a claimant suffers from disabling limitations.  *See Vargas v. Lambert*, 159 F.3d 1161,

9  1164 n.2 (9th Cir. 1998) (GAF scores are "rough estimates of an individual's psychological,

10 social, and occupational functioning used to reflect the individual's need for treatment"); *Mann v.*

11 *Astrue*, No. EDCV 08-1338-AN, 2009 WL 2246350 at *2 (C.D. Cal. Jan. 24, 2009) (GAF scores

12 are unreliable indicators of a claimant's ability to perform sustained work, as they are "merely a

13 snapshot in time" that may or may not be supported by the overall medical record).  The ALJ did

14 not err by refusing to base his entire finding regarding Dr. Guzzetta's opinion on a single piece of

15 information, taken in isolation, like a GAF score.  *See Margulis v. Colvin*, No. 1:13-CV-02021-

16 SKO, 2015 WL 1021117 at *17 (E.D. Cal. Mar. 9, 2015) (citing 20 CFR § 416.926a(e)(4)(i)).

17      In sum, the ALJ accorded proper weight to Dr. Guzzetta's opinion that Plaintiff suffered

18 from opioid and nicotine dependence and recommendation that she seek detoxification treatment.

19
20   **d.     The ALJ Failed to Articulate Legally Sufficient Reasons for Rejecting In Whole or In Part the Opinions of Drs. Murillo and Michiel**

21      Plaintiff asserts that the ALJ improperly accorded "apparently . . . significant weight" to

22 Dr. Michiel's opinion despite that "a one-time examination report in bipolar cases is of little

23 probative value."   (Doc. 16, p. 18.)  Plaintiff argues the ALJ erroneously failed to include "Dr.

24 Michiel's opinion that Plaintiff could only 'maintain attention and concentration and to carry out

25 simple job instructions'" and Dr. Murillo's opinion that Plaintiff was limited to simple, repetitive

26 tasks with limited public contact in his hypothetical to the VE.  (Doc. 16, pp. 24-25.)  Further,

27 while acknowledging the ALJ "apparently gave significant weight" to Dr. Guzzetta's diagnoses of

28 opioid and nicotine dependence, Plaintiff asserts that the ALJ failed to address Dr. Guzzetta's

1  opined GAF score of 45, indicating Plaintiff's mental functioning was "seriously impaired."

2  (Doc. 16, p. 18.)  As a result, Plaintiff alleges the ALJ erred by finding that Plaintiff could perform

3  work requiring an SVP of 3 and a Reasoning Level of 3, when Plaintiff was limited to simple

4  work consistent with Reasoning Level 1.  (Doc. 16, p. 24.)  Plaintiff contends that "[t]his picking

5  and choosing of the psychiatric evidence [ ] undermines the ALJ's findings that Plaintiff did not

6  have a severe mental impairment."  (Doc. 16, p. 24 (citing *Edlund*, 253 F.3d at 1159).)  The

7  Commissioner responds that "[w]ithin his discretion as adjudicator," the ALJ properly refused to

8  "adopt the State agency experts' opinions that plaintiff had a severe mental impairment."

9  (Doc. 17, p. 8 (citing *Magallanes*, 881 F.2d at 753).)

10     The ALJ noted in his decision that Dr. Michiel diagnosed Plaintiff with a mood disorder

11  and depression, directly related to Plaintiff's physical impairments of lupus, fibromyalgia, and

12  rheumatoid arthritis.  "He assessed a GAF of 55-60 and opined that she could maintain attention

13  and concentration for simple job instructions and relate to and interact with others."  (AR 42.)  The

14  ALJ neither discussed whether he fully or partially credited Dr. Michiel's opinion (*see* AR 42; 46),

15  nor included the limitations to which Dr. Michiel opined in his RFC assessment.  (*See* AR 44

16  (finding that Plaintiff retained the RFC "to perform light work . . . except that she only

17  occasionally can stoop, crouch, and crawl.  She requires the option to alternate between sitting and

18  standing every 30 minutes").)  Absent any discussion in the decision as to why the ALJ was not

19  adopting Dr. Michiel's opined mental limitations, it is unclear why the ALJ did not include a

20  limitation to "simple job instructions" in his hypothetical to the VE or within his RFC assessment.

21     State agency medical consultant Dr. Murillo completed a psychiatric review technique

22  form on July 10, 2010, opining that Plaintiff suffered from a mood disorder, NOS, and post-

23  traumatic stress disorder.  (AR 386-90.)  Dr. Murillo opined that Plaintiff was mildly limited in her

24  activities of daily living and ability to maintain concentration, persistence, and pace, moderately

25  limited in her ability to maintain social functioning, and that there was insufficient evidence to

26  determine whether she had experienced repeated episodes of decompensation.  (AR 394.)  Dr.

27  Murrillo also completed a mental RFC assessment, opining Plaintiff was moderately limited in her

28  ability to understand, remember, and carry out detailed instructions.  (AR 397-99.)  The ALJ did

1    not discuss Dr. Murillo's opinion, either by summarizing Dr. Murillo's findings, by discussing

2    what weight, if any, he was crediting to Dr. Murillo's opinion (*see* AR 42-46), or by including the

3    limitations to which Dr. Murillo in his RFC assessment.  (*See* AR 44 (finding that Plaintiff

4    retained the RFC "to perform light work . . . except that she only occasionally can stoop, crouch,

5    and crawl.  She requires the option to alternate between sitting and standing every 30 minutes").)

6    Absent any discussion in the decision as to why the ALJ was not adopting Dr. Murillo's opined

7    mental limitations, it is unclear why the ALJ did not include a limitation to Plaintiff's "ability to

8    understand, remember, and carry out detailed instructions" in his hypothetical to the VE or within

9    his RFC assessment.

10       The Commissioner contends the ALJ was not required to discuss every piece of evidence

11   in the record, and that the ALJ acted within his discretion as an adjudicator in not adopting the

12   State agency experts' opinions that Plaintiff had a severe mental impairment.  (Doc. 17, p. 8.)

13   While the ALJ "need not discuss *all* evidence," he is required to "explain why significant

14   probative evidence has been rejected."  *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393,

15   1394 (9th Cir. 1984) (citing *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)) (internal

16   quotations omitted); *see also Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("the ALJ is not

17   required to discuss evidence that is neither significant nor probative" (citing *Howard ex rel. Wolff*

18   *v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003))).  It is prejudicial error to disregard significant

19   and probative evidence without comment.  *See Vincent*, 739 F.2d at 1394.

20       Here, the evidence not discussed by the ALJ is significant and probative.  The ALJ did not

21   incorporate Drs. Murrillo or Michiel's opined mental limitations into his RFC assessment.  (*See*

22   AR 44.)  Had he incorporated these physicians' opinions into his assessed RFC, the ALJ may have

23   found Plaintiff incapable of work.  These opinions bear not only on Plaintiff's ability to perform

24   her past work[6], but also on her ability to perform other work at different exertional levels.  Having

25

26   [6]    The ALJ determined, based on VE testimony, that Plaintiff was capable of performing past relevant work as a gate
     guard or as a lobby guard, a subset of the security guard occupation.  (AR 48.)  Under the DOT, the occupations of
27   gate guard and lobby guard require a Reasoning Level of 3: the ability to "[a]pply commonsense understanding to
     carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several
28   concrete variable in or from standardized situations."  DOT 372.667-030; 372.667-034.

33

rejected Dr. Kren's opinion as to Plaintiff's mental impairments and mental limitations, the only medical evidence of Plaintiff's mental condition was the opinions of Drs. Murrillo and Michiel. Despite that agency reviewing physician Dr. Graciano affirmed an RFC limiting to Plaintiff to simple, repetitive tasks with limited public contact on reconsideration (AR 446-47), the ALJ also failed to discuss this opinion.   The ALJ's silent rejection of these physicians' opined mental limitations leaves the Court unable to determine whether a mental limitation to simple job instructions was necessary or dispositive.  (*See* AR 42; 384; 397-99.)  *Schafer v. Astrue*, 518 F.3d 1067, 1069-70 (9th Cir. 2008) (ALJ's silent disregard of nonexamining physician contravened regulations requiring evaluation of every medical opinion received); *see also* 20 CFR 404.1527(d), (f) (stating nonexamining source opinions are medical opinions the ALJ must consider and weight); SSR 96-6p, 1996 WL 374180 (ALJ "may not ignore" state agency consultant opinions and "must explain the weight given to these opinions in their decisions").

While the role of the Court is not to substitute its discretion in the place of the ALJ, *Edlund*, 253 F.3d at 1156; *Macri*, 93 F.3d at 543, the Court is also not empowered to scour the record to procure a legally sufficient reason the ALJ himself did not articulate in order to affirm the ALJ "on a ground upon which he did not rely[,]" *Orn*, 495 F.3d at 630; *Brown-Hunter v. Colvin*, __ F.3d __, No. 13-15213, 2015 WL 4620123, at *4 (9th Cir. Aug. 4, 2015) (a reviewing court "may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless"); *Marsh v. Colvin*, __ F.3d __, No. 12-17014, 2015 WL 4153858 (9th Cir. July 10, 2015) (a district court may not find harmless error by "affirm[ing] the agency on a ground not invoked by the ALJ").   The ALJ was required to address the medical opinion evidence that Plaintiff had severe mental limitations within his RFC assessment and explain why he rejected this evidence.  Thus, remand is appropriate for the ALJ to consider these issues.  The Court expresses no view on whether the ALJ's ultimate conclusion was correct or whether contrary evidence supported his finding; the Court only concludes that the ALJ erred in failing to discuss significant and probative medical records.

In sum, because the ALJ did not articulate specific or legitimate reasons for discounting or disregarding the medical opinions of Drs. Michiel, Murillo, and Graciano, the ALJ must give

1    renewed consideration on remand to these medical opinions regarding Plaintiff's mental limitation

2    to simple, repetitive tasks.

3           **2.**     **The ALJ's Assessment of the Medical Evidence Regarding Plaintiff's Alleged Physical Impairments of Rheumatoid Arthritis, Lumbar Facet Syndrome, and**

4                     **Fibromyalgia**

5       Plaintiff contends the ALJ erred by failing to consider the severity of Plaintiff's

6    rheumatoid arthritis, Myofascial Pain Disorder (fibromyalgia), and lumbar facet syndrome on her

7    ability to work, despite medical evidence establishing these impairments in the record. (Doc. 16,

8    p. 19.) Plaintiff asserts the ALJ failed to explain his reasons for ignoring this medical evidence,

9    and to the extent the ALJ may have relied on the state agency consultative examiner's opinion to

10   discount Dr. Petraglia's diagnoses, such reliance was misplaced because the consultative examiner

11   never reviewed Dr. Petraglia's treating notes. (Doc. 16, p. 20.)

12       The Commissioner responds that the overall record was contradictory regarding Plaintiff's

13   alleged physical impairments and "Plaintiff has not shown that these other alleged impairments

14   required additional limitations." (Doc. 17, pp. 9-10.) According to the Commissioner, "the ALJ's

15   finding that Plaintiff could perform a modified range of light work despite all of her impairments

16   was supported by the overall record" and "any error here is harmless and does not warrant reversal

17   of the ALJ's decision." (Doc. 17, p. 10.)

18           **a.**     **Legal Standard**

19       A plaintiff bears the burden of proving that she is disabled. *Meanel v. Apfel*, 172 F.3d

20   1111, 1113 (9th Cir. 1999); 20 C.F.R. §§ 404.1512(a), 416.912(a). The mere diagnosis of an

21   impairment is not sufficient to sustain a finding of disability. *Key v. Heckler*, 754 F.2d 1545, 1549

22   (9th Cir. 1985); *see also Matthew v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of

23   impairment is insufficient proof of disability). A person is disabled if his impairments are severe

24   and meet the durational requirement of twelve months. 20 C.F.R. §§ 404.1505, 404.1520(a),

25   416.905, 416.920(a). A severe impairment is one that significantly limits the physical or mental

26   ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). Examples of basic work

27   activities include carrying out simple instructions, responding appropriately to usual work

28   situations, dealing with changes in a routine work setting, and performing ordinary physical

functions like walking and sitting.  *Id.* §§ 404.1521(b), 416.921(b).

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at Step 2 if the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (*i.e.*, the person's impairments have no more than a minimal effect on his physical or mental abilities to perform basic work activities).  Social Sec. Ruling ("SSR") 85-28, 1985 WL 56856.   In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basic work activities.  SSR 96-3p, 1996 WL 374181.   The Step 2 inquiry is a *de minimis* screening device to dispose of groundless or frivolous claims.  *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987).

          **b.**      **Plaintiff Failed to Establish Evidence of Severe Physical Impairments of Rheumatoid Arthritis, Myofascial Pain Disorder, or Lumbar Facet Syndrome**

As an initial matter, Plaintiff "alleged disability due to degenerative disc disease, lupus, arthritis, fibromyalgia, and a bipolar disorder."  (AR 44.)  Plaintiff did not allege disability due to lumbar facet syndrome or myofascial pain disorder.  (*See* AR 44; 96; 105; 198.)  At Step 2, the ALJ found the evidence established severe impairments of lumbar degenerative disc disease and a history of substance abuse.  (AR 41.)   The ALJ then summarized the only relevant medical evidence of Plaintiff's alleged impairments of degenerative disc disease, lupus, arthritis, and fibromyalgia in his discussion of the record.  (AR 42-47.)

The only physician who diagnosed Plaintiff as having lumbar facet syndrome or myofascial pain disorder was Dr. Petraglia (s*ee* AR 442; 507), whose findings the ALJ discounted as inconsistent with "the lack of clinical findings by at least three objective evaluations."  (AR 47.)  Rheumatology specialist Dr. Gill found evidence supporting a diagnosis of "clinically active" rheumatoid arthritis, for which he prescribed Methotrexate 10 mg once a week.  (AR 427 (Plaintiff "has a strongly positive rheumatoid factor and anti-CCP antibody, with a negative ANA and

1   increased ESR of 55").   Dr. Gill did not note any clinical findings supporting a diagnosis of

2   myofascial pain disorder or lumbar facet syndrome; he only noted Plaintiff had reported a history

3   of chronic lower back pain/degenerative joint disease and fibromyalgia.  (*See* AR 427.)

4         Contrary to Plaintiff's representation, the record is nearly devoid of clinical findings or

5   evidence supporting these diagnoses.   Plaintiff told Dr. Kren she was "[b]eing evaluated" for

6   rheumatoid arthritis as part of her Worker's Compensation case.  (AR 569; 571.)  During her May

7   2010 psychiatric evaluation, Plaintiff told Dr. Michiel she had been diagnosed with rheumatoid

8   arthritis and fibromyalgia in 2002.   (AR 382.)   During her May 2010, internal medicine

9   evaluation, Plaintiff reported a history of rheumatoid arthritis and fibromyalgia, and noted she had

10  lupus on a medical source vendor questionnaire sheet to Dr. Stultz.  (AR 365.)  Plaintiff further

11  complained of disc disease and arthritis in her spine, as well as both back and bilateral leg pain

12  and a feeling "like she is standing in warm water on a constant basis." (AR 365.)  Dr. Stoltz

13  diagnosed Plaintiff with chronic pain syndrome and psychiatric issues, but concluded that while

14  Plaintiff suffered from "back and lower extremity pain" there were "*no findings whatsoever* of any

15  rheumatologic disease such as rheumatoid arthritis, lupus [ ]or fibromyalgia."  (AR 370 (italics

16  added).)

17        It is the claimant who bears the burden of proving she is disabled by presenting "complete

18  and detailed objective medical reports of her condition from licensed medical professionals."

19  *Meanel*, 172 F.3d at 1113 (citing *Johnson*, 60 F.3d at 1432; 20 C.F.R. §§ 404.1512(a)-(b),

20  404.1513(d)).   Plaintiff points to rheumatologist Dr. Gill's diagnosis of "clinically active"

21  rheumatoid arthritis based upon blood test results, and treating pain specialist Dr. Petraglia's

22  diagnosis of rheumatoid arthritis based on his clinical findings and imaging studies.  (Doc. 16,

23  p. 19 (citing AR 427; 431-80; 505-31).)  Plaintiff contends the ALJ was required to either accept

24  or adequately explain his reasons for rejecting Drs. Gill and Petraglia's opinions in this regard, and

25  the ALJ's failure to provide specific and legitimate reasons for rejecting these opinions is

26  reversible legal error.  (Doc. 16, p. 26.)

27        Drs. Gill and Petraglia's clinical findings provide little basis to substantiate the diagnoses

28  for rheumatoid arthritis.   Even assuming, however, that these limited clinical findings were

1  sufficient to establish Plaintiff's diagnosis for rheumatoid arthritis represented a medically

2  determinable condition, there is no evidence how Plaintiff was limited by this condition such that

3  it should have been considered "severe" at Step 2.  Imaging studies "found very little pathology

4  consistent with [Plaintiff]'s reports" and medical examinations by Drs. Stoltz, Michiel, and Gill

5  indicated "no or very few clinical signs consistent with [Plaintiff]'s reports[.]"  (AR 47.)  As the

6  Commissioner notes, Plaintiff's clinical examinations were relatively unremarkable and showed

7  no disabling functional limitations.  (Doc. 17, p. 9 (citing AR 298; 304; 307; 311; 315; 319; 368-

8  69; 501).)

9      As it pertains to fibromyalgia, Dr. Gill only noted Plaintiff reported a "history" of

10  fibromyalgia; he did not diagnose Plaintiff with fibromyalgia or note any clinical signs or

11  symptoms supporting this diagnosis.  (*See* AR 426-27.)  Pursuant to SSR 12-2p, 2012 WL

12  3104869, at *2-3, a fibromyalgia diagnosis must be established by findings – a mere diagnosis

13  alone is insufficient.  A fibromyalgia diagnosis must be supported by (1) a history of widespread

14  pain, (2) at least 11 positive tender points on physical examination bilaterally and both above and

15  below the waist, and (3) evidence that other disorders that could cause the symptoms or signs were

16  excluded.  Dr. Gill's treating records related to Plaintiff's asserted fibromyalgia do not meet the

17  criteria necessary to establish the diagnosis.  The evidence is insufficient to establish Dr. Gill's

18  notation of a history of fibromyalgia represented a medically determinable condition.

19      Even assuming fibromyalgia and rheumatoid arthritis were sufficiently established by

20  clinical signs and findings, the ALJ did not err in failing to consider these severe conditions.

21  Beyond mere diagnoses of these conditions, even Dr. Petraglia, upon whom Plaintiff explicitly

22  relies, did not identify any severe or disabling functional limitations imposed by his diagnoses.

23  (*See* AR 442; 507 (identifying physical limitations on examination).)  Significantly, consultative

24  examiner Dr. Stoltz found "no findings whatsoever of any rheumatologic disease" and state

25  agency consultative expert Dr. Reddy noted the evidence showed no established diagnosis of

26  fibromyalgia.  (Doc. 17, p. 9 (citing AR 370; 372).)  Rheumatologist Dr. Gill never opined that

27  Plaintiff was disabled by her fibromyalgia or rheumatoid arthritis diagnoses.  (*See* AR 426-27.)

28  Though Plaintiff argues that the ALJ should have found Plaintiff's alleged impairments of

1  fibromyalgia and rheumatoid arthritis severe at Step 2, there is no indication that Plaintiff's

2  rheumatoid arthritis was not adequately controlled by her once-a-week 10 mg Methotrexate

3  prescription or that any medical provider opined that Plaintiff was precluded from working due to

4  limitations imposed by or symptoms of her rheumatologic diseases.  (See AR 46-47.)

5        Absent evidence in the record that Plaintiff's alleged impairments imposed disabling

6  limitations, the ALJ was not required to further review or explain diagnoses that did not appear to

7  impose additional physical limitations beyond those already incorporated in his RFC assessment.

8  *See Matthews*, 10 F.3d at 680.  Here, there is no medical opinion in the record opining that

9  Plaintiff is disabled or even extremely limited by her rheumatologic diseases.  *C.f., Benecke v.*

10 *Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (the Court found the ALJ erred by failing to address

11 the plaintiff's severe impairment of fibromyalgia clearly demonstrated within the record, where

12 multiple rheumatologists opined plaintiff to be extremely limited by her *disabling* fibromyalgia,

13 plaintiff "consistently reported severe fibromyalgia symptoms both before and after diagnosis,"

14 and plaintiff's medical record contained significant evidence of fibromyalgia pre-dating her

15 disability application).  Though Plaintiff argues the ALJ should have adopted the opinions of Drs.

16 Gill and Petraglia, she fails to point to any opinion from either physician indicating that they

17 assessed her with functional limitations based on these diagnoses or any other impairment.  *See*

18 *Matthews*, 10 F.3d at 680 ("[t]he mere existence of an impairment is insufficient proof of a

19 disability") (citing *Sample v. Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1982) (same)).  Moreover,

20 even if the ALJ erred, such error is harmless because no further functional limitations have been

21 identified to be included in her RFC.

22        Finally, Plaintiff argues that the ALJ should have adequately explained his rejection of Dr.

23 Petraglia's diagnosis of lumbar facet syndrome.  (Doc., 16, p. 26.)  However, the single mention of

24 this diagnosis in a treating note on May 18, 2011, without any further mention or support within

25 the record, is not sufficient to sustain a finding of disability.  *Matthew*, 10 F.3d at 680; *see also*

26 20 C.F.R. § 416.908 ("A physical or mental impairment must be established by medical evidence

27 consisting of signs, symptoms, and laboratory findings, not only by your statement of

28 symptoms"); 42 U.S.C. §§ 423(d)(3), 1382a(3)(D) (a "physical or mental impairment" is one

1   that "results from anatomical, physiological, or psychological abnormalities which are

2   demonstrable by medically acceptable clinical and laboratory diagnostic techniques").

3      In sum, because Plaintiff failed to establish severe physical impairments of rheumatoid

4   arthritis, fibromyalgia, and lumbar facet syndrome, the ALJ did not err by not considering these

5   impairments at Step 2.

6   **B.      The ALJ's Evaluation of Testimony**

7      Plaintiff next argues the ALJ failed to articulate clear and convincing reasons for

8   discounting her statements regarding the severity and extent of her ongoing symptoms.  (Doc. 16,

9   pp. 28-32.)  Plaintiff further argues that the ALJ erroneously dismissed the testimony of Plaintiff's

10  husband Oscar Alcantar.  (Doc. 16, pp. 32-33.)  The Commissioner asserts the ALJ properly

11  evaluated both Plaintiff's subjective complaints and Plaintiff's husband's lay witness testimony.

12  (Doc. 17, pp. 11-15.)

13          **1.      The ALJ Properly Evaluated Plaintiff's Subjective Testimony**

14     Plaintiff contends she "consistently complained of disabling pain and psychiatric

15  symptoms" but the ALJ "gave her complaints short shrift and rejected them" without providing

16  legally adequate reasons for discounting her credibility.  (Doc. 16, p. 21.)  The Commissioner

17  responds that "the ALJ provided a valid basis for finding Plaintiff not fully credible and his

18  reasons were supported by substantial evidence."  (Doc. 17, p. 11.)

19              **a.      Legal Standard**

20     In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

21  must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

22  *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether

23  the claimant has presented objective medical evidence of an underlying impairment that could

24  reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

25  The claimant is not required to show that her impairment "could reasonably be expected to cause

26  the severity of the symptom [she] has alleged; she need only show that it could reasonably have

27  caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the

28  claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

1  claimant's testimony about the severity of the symptoms if she gives "specific, clear and

2  convincing reasons" for the rejection.  *Id.*

3      The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

4  statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

5  seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

6  *Tommasetti*, 533 F.3d at 1041; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-

7  27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529,

8  416.929.  "If the ALJ's finding is supported by substantial evidence, the court may not engage in

9  second-guessing."  *Tommasetti*, 533 F.3d at 1039.

10          **b.**      **The ALJ Pointed to Substantial Evidence in the Record to Discount**

11                      **Plaintiff's Credibility**

12      Plaintiff contends the ALJ improperly discredited her testimony because "she had 'not

13  received the type of treatment one would expect of a totally disabled individual,' stating that there

14  was no indication that epidural steroid injections or surgery had been recommended."  (Doc. 16,

15  p. 23 (quoting AR 47).)  The Commissioner asserts that the ALJ properly pointed to Plaintiff's

16  history of conservative treatment and testimony at the hearing that she was not taking any

17  medications whatsoever as substantial evidence to discount Plaintiff's credibility.  (Doc. 17, p. 13

18  (citing *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (evidence of conservative treatment

19  is sufficient to discount a claimant's testimony regarding severity of an impairment)).)  While

20  treating physician Dr. Petraglia had recommended injections in December of 2010 and January of

21  2011 (AR 460; 463) and Dr. Bhatia noted Plaintiff's report that she had received epidural

22  injections in the past which had failed to provide her with relief from her symptoms (AR 332),

23  there is no medical evidence that Plaintiff ever received those injections or sought follow-up for

24  more aggressive treatments for her back pain.

25      Dr. Bhatia also requested a surgical consult in March 2008, because Plaintiff was "getting

26  up higher on the pain medications ladder and presently [was] taking almost 8 to 10 Vicodin with

27  Norco a day."  (AR 331; 603)  There is no evidence that Plaintiff actually saw a surgeon, that a

28  lesion was identified that would warrant surgical intervention, or that surgical intervention was

1  deemed advisable or necessary.  (*See* AR 325; 331; *see also* AR 603.)  Dr. Bhatia did not opine

2  that surgery was necessary during later examinations, and in fact, in July 2008 he recommended

3  Plaintiff do stretching and prescribed an inversion table to "help her significantly in the pain."

4  (AR 319.)  Dr. Bhatia also opined at the time that Plaintiff would be able to return to work in a

5  month.  (AR 319.)  In January 2009, Dr. Kren noted that Plaintiff told her surgery had been ruled

6  out and she had instead been referred to physical therapy for conservative treatment.  (AR 585.)

7  While Plaintiff had a long history of prescriptions for – and abuse of – strong pain

8  medications, she testified that since November 2011 she had not used any medication.  (AR 47.)

9  During the hearing, Plaintiff "admitted to a history of cocaine use and that she used her

10 prescription medications too quickly."  (AR 47.)  It is unclear whether Plaintiff's frequent requests

11 for pain medication from every treating or examining physician were the result of painkiller

12 addiction or actual pain arising from her alleged impairments.  The ALJ's interpretation of the

13 evidence on this issue is entitled to deference and "the ALJ's interpretation that [Plaintiff] [wa]s

14 engaged in drug-seeking behavior" as a part of her substance abuse and addiction, rather than to

15 treat her allegedly excruciating pain, "is a clear and convincing reason for disregarding h[er]

16 testimony."  *Massey v. Comm'r Soc. Sec. Admin.*, 400 Fed. Appx. 192, 194 (9th Cir. 2010) (citing

17 *Burch*, 400 F.3d at 679; *Edlund*, 253 F.3d at 1157).  The ALJ was also permitted to consider as

18 one factor of his credibility analysis Plaintiff's physicians' failure to prescribe, and Plaintiff's

19 failure to request, any serious medical treatment once her addiction had been addressed by

20 substance abuse treatment.  *See Bunnell*, 947 F.2d at 346 (en banc) ("unexplained, or inadequately

21 explained, failure to seek treatment or follow a prescribed course of treatment" is a relevant factor

22 in assessing credibility of pain testimony) (internal quotation marks omitted).

23 Plaintiff then argues that the ALJ failed to properly consider the side effects of Plaintiff's

24 medications.  (Doc. 16, p. 22.)  The Commissioner responds that this argument is "meritless"

25 because Plaintiff testified at the hearing that she "had been discharged from treatment with Dr.

26 Petraglia and was not using prescription or any other drugs, and Plaintiff confirmed that she had

27 not used drugs since going through a detox[ification] program in November 2011[.]"  (Doc. 17,

28 p. 13.)  Plaintiff must "show that any medication side-effects caused symptoms that would create

disabling limitations for a 12 month period" to establish disabling limitations as a result of medication side effects.  20 C.F.R. § 404.1527(a) (a claimant "can only be found disabled if she is unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").  Here, Plaintiff testified that she is no longer taking any medications; therefore, the ALJ was not required to evaluate the side effects of any medication on Plaintiff's ability to perform work.  (*See* AR 47; 60; 75.)

Plaintiff also contends the ALJ erroneously based his credibility determination, at least in part, on the legally inadequate reasoning that "[Plaintiff] and her husband apparently decided she did not have to go back to work [in October/November] 2008 which raises some questions as to whether the current unemployment truly is the result of medical problems."  (Doc. 16, p. 25 (quoting AR 47); *see also* AR 587; 591.)  The Commissioner responds that "the ALJ reasonably found that the decision between Plaintiff and her husband that she not go back to work undermined her subjective complaints[.]" (Doc. 17, p. 13.)

"In weighing a [Plaintiff]'s credibility, the ALJ may consider 'ordinary techniques of credibility evaluation, such as . . . other testimony by the claimant that appears less than candid[.]'"  *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).  Plaintiff told Dr. Kren on two separate occasions that she was not planning on returning to work.  (AR 587; 591.)  The ALJ permissibly relied on Plaintiff's admission to a treating physician that she and her spouse had decided she would not return to work as a measure of Plaintiff's candidness and credibility.

Plaintiff further asserts that, regardless, the ALJ erroneously found Plaintiff's testimony was not supported by the medical record.  (Doc. 16, p. 31.)  Plaintiff contends that "the simple fact that the findings of the examining consultants was inconsistent with the findings [of] Plaintiff's treating sources  . . . is a legally inadequate reason for discounting their significant clinical findings."  (Doc. 16, p. 31.)  Plaintiff further contends that the ALJ "lacked the expertise" to review the "extensive and detailed treatment records" of Drs. Kren and Petraglia without the

1  benefit of a medical expert.  (Doc. 16, p. 31 (citing SSR 96-6p (if "medical judgment" is required,

2  the ALJ must seek medical expert opinion).)   The Commissioner responds that "[t]he ALJ is

3  responsible for reviewing the entire record and basing his disability determination on the overall

4  evidence" (Doc. 17, p. 13 (citing *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).)

5        While the inconsistency of objective findings with subjective pain complaints may not be

6  the sole reason for rejecting subjective complaints of pain, *Light v. Soc. Sec. Admin.*, 119 F.3d

7  789, 792 (9th Cir. 1997), it is one factor which may be permissibly considered with others, *Moisa

8  v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d

9  595, 600 (9th Cir. 1999).   Here, the ALJ pointed to multiple inconsistencies between Plaintiff's

10  reports of pain and the objective record.  (AR 45-46.)

11        For example, though Plaintiff claimed disabling pain precludes her ability to work,

12  Dr. Bhatia advised Plaintiff that an MRI revealed no nerves were being compressed in her spine

13  and, to relieve her symptoms, she should "do some stretching exercises."  (AR 45.)  During an

14  October 2009 follow-up appointment, Dr. Bhatia noted Plaintiff presented with a normal gait, no

15  atrophy, normal motor and tone, and a normal sensory examination.  (AR 45.)  Plaintiff was then

16  seen by Dr. Guzzetta and "denied having any muscle or joint problems, contrary to her assertion

17  that she has constant pain."  (AR 45.)  On examination, Plaintiff had "no tenderness in the back,

18  normal muscle bulk and tone, no evidence of a gait abnormality, intact sensation throughout, and

19  normal reflexes."  (AR 45.)  Plaintiff also complained to state agency examiner Dr. Stoltz of back

20  and bilateral leg pain and reported a history of a work-related injury to her back and a diagnosis of

21  rheumatoid arthritis.  (AR 46.)  However, "Dr. Stoltz noted no negative clinical signs except

22  [Plaintiff] reported back pain to simple light touch in the lumbar paraspinal area[ ] [and he]

23  observed poor effort on forward flexion of the lumbar spine.  Dr. Stoltz concluded that his

24  examination elicited no clinical findings consistent with [Plaintiff]'s reported back pain.  He

25  therefore assessed no functional limitations."  (AR 46.)

26        Contrary to Plaintiff's assertion, citing observations by three treating and examining

27  physicians and objective imaging over the course of four years is not 'cherry-picking' medical

28  evidence.   ALJs may permissibly point to "medical signs and laboratory findings that

1  . . . demonstrate worsening or improvement of the underlying medical condition" to "draw

2  appropriate inferences about the credibility of an individual's statements."  *See* SSR 96-7p, 1996

3  WL 374186.  Here, the ALJ pointed to substantial medical evidence in the medical record as

4  inconsistent with Plaintiff's subjective complaints.

5       The Court must review the medical record as a whole, and if substantial evidence exists to

6  support the ALJ's conclusion, the Court must affirm that decision.  *Desrosiers v. Sec'y of Health*

7  *& Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole,

8  "weighing both the evidence that supports and the evidence that detracts from the

9  [Commissioner's] conclusion.").  These discrepancies were not the sole basis for the ALJ's

10 decision; they were, however, additional inconsistencies in the record that the ALJ permissibly

11 considered in evaluating Plaintiff's credibility.  *See Moisa*, 367 F.3d at 885; *Thomas*, 278 F.3d at

12 958-59; *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJs may consider whether the

13 Plaintiff's testimony is believable or not).  Moreover, the ALJ was entitled to make an inference

14 regarding the discrepancy between the statements.  The fact that Plaintiff can offer a second,

15 rational interpretation to synthesize the statements does not permit the Court to discard the ALJ's

16 credibility finding.  *Thomas*, 278 F.3d at 954; *Andrews*, 53 F.3d at 1041; *Sprague*, 812 F.2d at

17 1229-30.

18      Plaintiff next asserts the ALJ improperly discounted her credibility as being inconsistent

19 with her admitted activities of daily living, including "her ability to drive, shop, do housework,

20 and take care of a young child."  (Doc. 16, p. 23 (citing AR 47.)  Plaintiff argues these "[s]poradic

21 activities are not at all inconsistent with [her] testimony of disabling limitations" and "are not clear

22 and convincing reasons for disbelieving" her testimony.  (Doc. 16, p. 23.)  The Commissioner

23 responds that "Plaintiff's argument that her reported activities are sporadic is baseless as Plaintiff

24 consistently reported in the Function Report and her hearing testimony that she performed them."

25 (Doc. 17, p. 12.)

26      While the mere fact that a claimant engages in certain daily activities does not necessarily

27 detract from her credibility as to overall disability, daily activities support an adverse credibility

28 finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the

1    performance of physical functions or skills that are transferable to a work setting.  *Orn*, 495 F.3d

2    at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such as preparing

3    meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others

4    has been considered sufficient evidence to support an adverse credibility finding when performed

5    for a substantial portion of the day.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir.

6    2008); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.  "Even

7    where those activities suggest some difficulty functioning, they may be grounds for discrediting

8    [Plaintiff]'s testimony to the extent that they contradict claims of a totally debilitating

9    impairment."  *Molina,* 674 F.3d at 1113 (internal citations omitted).  Here, the ALJ appropriately

10   considered Plaintiff's admitted activities of daily living:

11
> In March 2010, [Plaintiff] described her activities to include fixing simple meals,
12   doing laundry, watching television, and taking care of her grandson (Exhibit 5E).
> She also was able to do some yard work with her husband.  She was able to drive
13   herself to the store and pay bills.  She socialized some with family and friends.

14
> . . . [At the hearing, Plaintiff] described daily activities that are not limited to the
15   extent one would expect, given the complaints of disabling symptoms and
> limitations.  She is able to drive, shop, and do housework.  [Plaintiff] also is able
16   to care for a young child at home, which can be quite demanding both physically
> and emotionally.

17   (AR 44-45.)

18       Contrary to Plaintiff's contention, her admitted activities are not "sporadic" and "part

19   time."  (Doc. 16, p. 29.)  This is not a case where the plaintiff testified that she was completely

20   dependent for her activities of daily living.  Plaintiff cared for her personal needs, prepared simple

21   meals, loaded the dishwasher, did laundry, helped her husband with yard work, drove and used

22   public transportation, shopped in stores, read, watched television, and socialized with family and

23   friends (AR 69-71) – these types of activities tend to suggest Plaintiff is still be capable of

24   performing the basic demands of unskilled work on a sustained basis.  *See, e.g., Stubbs-Danielson*,

25   539 F.3d at 1175 (the ALJ sufficiently explained his reasons for discrediting the claimant's

26   testimony because the record reflected that the claimant performed normal activities of daily

27   living, including cooking, housecleaning, doing laundry, and helping her husband in managing

28   finances – all of which "tend[ed] to suggest that the claimant may still be capable of performing

1  the basic demands of competitive, remunerative, unskilled work on a sustained basis."). Plaintiff

2  obtained partial custody of her grandson and acts as his primary caregiver every other week,

3  further evidence undermining her claim of total disability. *See Rollins*, 261 F.3d at 857 (claim of

4  total disability "was undermined by [claimant's] testimony about her daily activities, such as

5  attending to the needs of her two young children").

6      "It is true that [Plaintiff]'s testimony was somewhat equivocal about how regularly she was

7  able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not

8  be the only reasonable one. But it is still a reasonable interpretation and is supported by

9  substantial evidence; thus, it is not our role to second-guess it." *Id.* (citing *Fair*, 885 F.2d at 604);

10 *see also Thomas*, 278 F.3d at 954 (where "evidence is susceptible to more than one rational

11 interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

12 upheld[,]"); *Andrews*, 53 F.3d at 1041. Just because there is more than one way to reasonably

13 interpret the evidence in the record does not mean that the ALJ committed reversible error. *See,*

14 *e.g., Sprague*, 812 F.2d at 1229-30.

15     Finally, Plaintiff argues that "the ALJ's failure to acknowledge" her rheumatoid arthritis,

16 myofascial pain disorder, and lumbar facet syndrome diagnoses at Step 2 "rendered his credibility

17 findings unclear and unconvincing." (Doc. 16, p. 22.) As part of the two-step credibility analysis,

18 an ALJ must first determine whether a claimant has presented objective medical evidence of an

19 underlying impairment that could reasonably be expected to produce the pain or other symptoms

20 alleged, and only where the claimant meets the first test is the ALJ required to provide "specific,

21 clear, and convincing reasons" for rejecting the claimant's subjective pain testimony. *Vasquez v.*

22 *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Lingenfelter*, 504 F.3d at 1036); *Bunnell v.*

23 *Sullivan*, 947 F.2d 341, 344-45 (9th Cir. 1991) (en banc) ("once the claimant produces objective

24 medical evidence of an underlying impairment, an adjudicator may not reject [the] claimant's

25 subjective complaints based solely on a lack of objective medical evidence to fully corroborate the

26 alleged severity of pain" and "must specifically make findings" supporting an adverse credibility

27 finding). As discussed above, Plaintiff failed to demonstrate that her diagnoses of rheumatoid

28 arthritis, myofascial pain disorder, and lumbar facet syndrome were medically severe impairments,

and therefore Plaintiff's argument that the ALJ's credibility findings were not clear and convincing fails.  *Id.*  Assuming, however, without deciding, that Plaintiff's diagnoses of rheumatoid arthritis, myofascial pain disorder, and lumbar facet syndrome did constitute a qualifying "severe impairment," as discussed above, the ALJ nonetheless stated sufficient specific reasons for not fully crediting Plaintiff's pain testimony.  *See Rollins*, 261 F.3d at 857 (even if plaintiff's diagnosis of fibromyalgia constituted a qualifying "severe impairment," the ALJ properly grounded credibility finding in inconsistencies between plaintiff's testimony and the medical evidence and plaintiff's activities of daily living).

In sum, the ALJ's reasons were properly supported by the record and sufficiently specific to allow the Court to conclude that he rejected the claimant's testimony on permissible grounds, and did not arbitrarily discredit Plaintiff's testimony.

### 2.   The ALJ Did Not Err in Assessing the Credibility of Lay Testimony

Plaintiff contends the ALJ also erred in rejecting the evidence from her husband Oscar Alcantar ("Oscar").  Plaintiff argues that the ALJ's reasons for finding him to be less than fully credible "cannot survive judicial review."  (Doc. 16, p. 33.)

### a.   Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. § 416.913(d)(4).  In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons."  *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness testimony if it is inconsistent with the record.  *See, e.g.*, *id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (rejecting lay witness testimony conflicting with the medical record).  The ALJ may "draw inferences logically flowing from the evidence."  *Sample*, 694 F.2d at 642.  Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."

1   *Molina*, 674 F.3d at 1114.

2          b.      **The ALJ Pointed to Substantial Evidence in the Record to Permissibly**
3                  **Discount Plaintiff's Husband's Credibility**

4          Plaintiff contends that the ALJ impermissibly rejected Oscar's testimony as "not consistent

5   with the medical evidence," a "reason [that] is not germane to [Oscar] and, thus, [ ] legally

6   inadequate."  (Doc. 16, p. 33 (citing *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2008) (ALJ

7   may not "discredit [ ] lay testimony as not supported by the medical evidence of record").)

8   Plaintiff also contends the ALJ improperly rejected Oscar's statements because "he did not discuss

9   her substance abuse," despite that "the ALJ did not consider whether substance abuse was a factor

10  material to Plaintiff's disability."  (Doc. 16, p. 33.)   The Commissioner argues that Oscar's

11  statements as to Plaintiff's physical symptoms were properly discounted as inconsistent with the

12  medical evidence (Doc. 17, p. 14 (citing *Bayliss*, 427 F.3d at 1218; *Greger v. Barnhart*, 464 F.3d

13  968, 972 (9th Cir. 2006) (ALJ properly discounted lay witness testimony because witness's

14  statements were "inconsistent" with claimant's presentation to doctors during the period at

15  issue)), and for not discussing the impact of Plaintiff's substance abuse, "which was an important

16  factor in her ability to maintain concentration and other activities" (Doc. 17, p. 15).

17         As noted by the ALJ, Plaintiff's husband "wrote similarly" that Plaintiff was mildly

18  limited in her daily activities.  (AR 45.)  He "observed that she had difficulty sleeping through the

19  night, needed reminders to take care of herself, and she was unable to stand or walk for more than

20  a few minutes, although she could shop for an hour."  (AR 45.)  The ALJ "assign[ed] very little

21  weight" to Oscar's opinion because

22         . . . While I appreciate [Oscar]'s observations about [Plaintiff]'s capabilities, they
           are not consistent with the medical evidence . . . and he did not discuss her
23         substance abuse, which is a very important factor in her ability to maintain
           concentration and other activities.
24

25  (AR 45.)

26         The ALJ was clear the primary reason Oscar's lay testimony was given reduced weight was

27  because, like Plaintiff's own testimony, it was inconsistent with the preponderance of medical

28  opinions and the observations made by medical sources.  (AR 45.)  The ALJ pointed a June 2008

MRI revealing mild degenerative changes and narrowing, with no compression of the thecal sac or nerve roots.  (AR 45.)  The ALJ also noted that treating physician Dr. Bhatia told Plaintiff "no nerves were being compressed and she should do some stretching exercises" to improve her symptoms, Plaintiff "denied having any muscle or joint problems, contrary to her assertion that she has constant back pain" to Dr. Guzzetta, and Dr. Stoltz "concluded that his examination elicited no clinical findings consistent with [Plaintiff]'s reported back pain."  (AR 45-46.)  The ALJ emphasized that "no treating or evaluating physician [has found Plaintiff] disable[d] from work due to her back pain[.]"  (AR 47.)  The ALJ did not rely on a "mere quantum" of medical evidence to discount Oscar's testimony; he identified sufficient evidence of Plaintiff's underlying medical condition to adequately support his conclusion that Oscar's lay testimony was inconsistent with the medical evidence.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The ALJ's finding that Oscar's statements conflicted with the weight of the medical evidence was a proper reason for rejecting his statements.  *Lewis*, 236 F.3d at 503 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence").  That the ALJ gives an additional reason for rejecting Oscar's lay testimony – he did not discuss Plaintiff's substance abuse – only gives an additional, germane reason underlying the ALJ's decision to discount Oscar's testimony regarding the intensity, duration, and limiting effects of Plaintiff's symptoms.  *See Parra*, 481 F.3d at 751 (lay witness's discussion or omission of discussion regarding a claimant's substance abuse is a legally sufficient reason for an ALJ to discount lay witness testimony).

In sum, the ALJ's reasons were properly supported by the record and sufficiently specific to allow the Court to conclude that he rejected Oscar's testimony on permissible grounds, and did not arbitrarily discredit Oscar's testimony.

**C.     Remand for One Issue**

This case shall be remanded for the ALJ to consider one issue: whether Plaintiff is limited to simple tasks as opined by Drs. Michiel, Murillo, and Graciano.  If the ALJ rejects these opinions, the reasons must be set forth.

In all other respects, the ALJ's findings are affirmed.

**VI.    CONCLUSION**

Based on the foregoing, the Court finds that remand is necessary to reconsider the medical opinion evidence of Plaintiff's mental limitations by Drs. Michiel, Murillo, and Graciano. Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Kelly Jean Alcantar and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 25, 2015**                          **/s/ Sheila K. Oberto**
                                                  UNITED STATES MAGISTRATE JUDGE